[4 NE3d 320, 981 NYS2d 310]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MALIK HOWARD, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HILBERT STANLEY, Appellant.

Argued October 10, 2013; decided November 26, 2013

### POINTS OF COUNSEL

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Rebekah J. Pazmiño* and *Eunice C. Lee* of counsel), for appellant in the first above-entitled action. I. Malik Howard's trial attorney was ineffective for failing: (a) to challenge the first-degree robbery charge on legal insufficiency grounds, where the prosecution's evidence was that Mr. Howard displayed only a BB gun, which does not satisfy the display of a firearm element; and (b) to alert the court to the fact that its final instructions could result in an improper verdict as they did not indicate that the jury had to be unanimous with respect to its choice of the two potential display theories at issue, or that showing only a BB gun could not satisfy the display element. (*People v Wilson*, 283 AD2d 339; *People v Jones*, 54 AD2d 740; *Strickland v Washington*, 466 US 668; *People v Benevento*, 91 NY2d 708; *People v Turner*, 5 NY3d 476; *People v Lopez*, 73 NY2d 214; *People v Baskerville*, 60 NY2d 374; *People v Groves*, 282 AD2d 278; *People v Washington*, 229 AD2d 601; *People v Simmons*, 186 AD2d 95.) II. The court below erred in denying Malik Howard's motion to suppress a showup identification which was far too attenuated, both spatially and temporally, from the crime itself, was not prompted by either exigency or an unbroken chain of events, and involved procedures that were unduly suggestive. (*People v Riley*, 70 NY2d 523; *People v Duuvon*, 77 NY2d 541; *People v Brisco*, 99 NY2d 596; *People v Wells*, 221 AD2d 281; *People v Gilford*, 16 NY3d 864; *People v McBride*, 242 AD2d 482; *People v Wall*, 38 AD3d 1341; *People v Andrews*, 255 AD2d 328; *People v Maybell*, 198 AD2d 108; *People v Ortiz*, 90 NY2d 533.)

*Steven Banks, The Legal Aid Society*, New York City (*Alan S. Axelrod* of counsel), for appellant in the second above-entitled action. I. Appellant was deprived of the effective assistance of counsel where the record shows that counsel failed to take action that could only have benefitted appellant, including not specifically moving for dismissal or reduction of the insufficiently proved first-degree robbery charge, failing to request the court to charge the jury that the BB gun could not constitute the display of what appeared to be a pistol necessary to

make out first-degree robbery, and acquiescing in the court's presentation to the jury of two different theories under which they could convict of the top charge, which rendered that count duplicitous and resulted in an invalid verdict. (*People v Turner*, 5 NY3d 476; *People v Baldi*, 54 NY2d 137; *Strickland v Washington*, 466 US 668; *People v Bell*, 48 NY2d 933; *People v Caban*, 5 NY3d 143; *People v Baskerville*, 60 NY2d 374; *People v Wilson*, 283 AD2d 339; *People v Fredericks*, 48 AD3d 827; *People v Keindl*, 68 NY2d 410; *People v Bauman*, 12 NY3d 152.) II. The court erred in refusing to suppress the showup identification of appellant, where the showup was not proximate to the commission of the crime in either time or space, the showup being conducted over two hours after the crime and a distance of five miles away, in the absence of any exigent circumstance to justify the showup, complainant having returned to his home and appellant already having been placed under arrest, and where the showup was unnecessarily suggestive. (*People v Duuvon*, 77 NY2d 541; *People v Johnson*, 81 NY2d 828; *People v Rivera*, 22 NY2d 453; *People v Riley*, 70 NY2d 523; *People v Brisco*, 99 NY2d 596; *People v Ortiz*, 90 NY2d 533; *People v Gilford*, 16 NY3d 864; *People v Wells*, 221 AD2d 281; *People v Colon*, 42 AD3d 411; *People v Adams*, 53 NY2d 241.)

*Robert T. Johnson, District Attorney*, Bronx (*Lindsey J. Ramistella, Joseph N. Ferdenzi* and *Peter D. Coddington* of counsel), for respondent in the first and second above-entitled actions. I. Defendants were not deprived of effective representation at trial. (*People v Parilla*, 8 NY3d 654; *Strickland v Washington*, 466 US 668; *People v Benevento*, 91 NY2d 708; *People v McDaniel*, 13 NY3d 751; *People v Taylor*, 1 NY3d 174; *People v Turner*, 5 NY3d 476; *People v Baldi*, 54 NY2d 137; *People v Stokes*, 25 AD3d 332; *People v Vasquez*, 20 NY3d 461; *People v Townsley*, 20 NY3d 294.) II. The showup identification was proper. (*People v Brisco*, 99 NY2d 596; *People v Gilford*, 16 NY3d 864; *People v Johnson*, 81 NY2d 828; *People v Duuvon*, 77 NY2d 541; *People v Hudson*, 71 AD3d 1046; *People v Maybell*, 198 AD2d 108; *People v Gatling*, 38 AD3d 239; *People v Berry*, 50 AD3d 1047; *People v Green*, 256 AD2d 85.)

## OPINION OF THE COURT

READ, J.

This appeal calls upon us to apply settled law to the unique facts of a gunpoint robbery. We conclude that defendants Malik Howard (Howard) and Hilbert Stanley (Stanley) (collectively,

defendants) were not deprived of effective representation at trial by, among other alleged omissions, counsel's failure to assert as an affirmative defense that one of two weapons allegedly displayed during the robbery "was not a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged" (Penal Law § 160.15 [4]). We further conclude that record support exists for the lower courts' determination that the robbery victim's showup identification of defendants was proper.

## I.

### The Robbery and its Aftermath

On April 21, 2006, just before 3:00 a.m., 38-year-old Domingo Lopez (Lopez), an immigrant from the Dominican Republic, was walking home from the restaurant where he worked as a waiter when a gray car approached him from behind, proceeding at a slow speed. He was on Claflin Avenue near 195th Street in the Bronx, a short distance from his apartment building. Lopez paid little heed to the car at first, assuming the driver was looking for a parking space. Suddenly, though, he became aware of movement, turned and saw two men, both black, rushing towards him. One, a heavyset man with dreadlocks, wore a striped polo shirt and emerged from the car's driver's seat. The other, armed with a gun and wearing a sweatshirt with a hood, got out of the front passenger seat. Lopez observed two other black men in the car's back seat, where they remained.

The two men who left the car cornered Lopez. The man with the gun stood in front of him, pressing the gun to his head and neck; the other man pushed up against him from behind. As Lopez later testified,

> "[o]ne of them, the thinner one or the skinnier one he had a gun in his hand . . . [He] was telling me to close my eyes and was touching my face. He told me to put my back and I felt the other person was touching me with something else on my back. I don't know. I cannot say it if was a gun or something else."

Working together, the two men tugged at Lopez's pants, rifling his pockets and ripping the back one in the process. They took Lopez's wallet from his back pocket, and $60 from his front pocket. The wallet contained $400 and various documents, including Lopez's driver's license from the Dominican Republic

and a learner's permit from New York State, a credit card and various identification cards. The night was clear and there was ambient light. Lopez got a good look at both robbers' faces.

After the robbers fled in the gray car, Lopez crossed the street to his apartment building and, upon reaching his residence, asked his teenaged stepdaughter to call 911. Lopez's native language is Spanish and, when he later testified through an interpreter, he characterized his command of English as "[a] little bit." His stepdaughter spoke Spanish and, apparently, much better English than he did.

Officer Judith Moreno and another uniformed police officer, responding to the 911 call, arrived at the scene of the robbery at roughly 3:00 a.m. to interview Lopez. The officers spoke English to Lopez, who communicated with them through his stepdaughter. Officer Moreno took handwritten notes, from which she later created a complaint report. This report included scant details about the robbers' appearance or the apparel they were wearing.

Lopez and his stepdaughter accompanied the officers as they drove around the area for awhile, looking for the robbers. When they did not spot them, Lopez and his stepdaughter returned home. In the meantime, the police broadcast a radio alert, reporting a gunpoint robbery at Claflin Avenue and 195th Street, which is in the 50th police precinct. The radio transmission, apparently based on the information given by Lopez through his stepdaughter to Officer Moreno, identified the suspects as four black males, armed and wearing hoodies, who escaped in a silver or gray late model car, possibly a Honda.[1]

Sergeant Edward Murphy and Police Officers Frank Burns and Brendan Owens, who were assigned to a police unit organized to combat street-level violence, were patrolling in the nearby 47th precinct when they heard the radio message about the Claflin Avenue robbery, sometime soon after 3:00 a.m. These officers, who wore plain clothes and drove an unmarked car, immediately drove to the vicinity of the robbery, and fruitlessly canvassed the area for the perpetrators for about 20 to 30 minutes before giving up and returning to the 47th precinct. Then, at about 4:15 a.m., while stopped at a red light at 236th

---

**1.** The exact wording of the radio message is not clear as there is no transcription of it in the record, and by the time of trial, memories differed slightly. But it does seem that the make mentioned for the getaway car was Honda, and that the message stated there were four black men in the car and did not describe any apparel worn by any of them other than hoodies.

Street and White Plains Road, traveling northbound, they saw a silver, four-door Pontiac facing them, heading south. This location is roughly five miles from the site of the robbery.

Officer Burns observed Howard, who was a front-seat passenger, and Stanley, the car's driver, holding bottles of beer. The police made a U-turn and drove up behind the Pontiac. When Officer Burns saw Howard drinking from the bottle, Sergeant Murphy, who was driving, put on the dash lights, signaling defendants to pull over and stop, which they did, followed by the police. As Officer Burns approached the passenger side of the Pontiac, he saw Howard reach down underneath his seat and he smelled marijuana. Officer Burns asked Howard "if there was anything inside the vehicle," and Howard replied that "he had a nickel bag for personal use," which Officer Burns understood to mean a $5 bag of marijuana. Officer Burns asked Howard to step out of the car, walk to the rear and stand near the bumper.

Meanwhile as Sergeant Murphy approached Stanley, the driver, he saw an open container of beer and, like Officer Burns, smelled marijuana. Sergeant Murphy directed Stanley to exit the vehicle and step to the rear. Both defendants stayed there with Officers Burns and Owens while Sergeant Murphy searched the interior of the car. He recovered two beer bottles and, from between the car's center console and driver's seat, a plastic wallet insert containing a driver's license and various other items of identification for Domingo Lopez of Claflin Avenue in the Bronx.

Sergeant Murphy, now strongly suspecting that defendants were involved in the Claflin Avenue robbery, handed the wallet insert to Officer Burns, and directed Officers Burns and Owens to return defendants to the vehicle. Sergeant Murphy then contacted the 50th precinct to see if the victim could be brought to White Plains Road. At the same time, Officers Burns and Owens searched the car's trunk, where they found a black knapsack. Officer Owens opened the knapsack, and discovered a large bag of marijuana and a black imitation pistol.

Lopez received a telephone call from a police officer with the 50th precinct at about 4:00 a.m. or 4:15 a.m., asking him in Spanish if he would go with the police "to see if the two people were there," which he understood to mean the "ones that robbed [him]." A police officer picked up Lopez and his stepdaughter. They conversed in Spanish about the robbery, but did not speak to the officer while on the way to White Plains

Road. When Lopez arrived at this destination at about 4:59 a.m., he became "very animated" when he saw Howard, explaining to Officer Burns that the "little guy, the little guy, he had the gun." Lopez observed defendants from 15 to 20 feet away. Their hands were behind their backs, and Lopez believed them to be handcuffed. Howard was wearing a hooded sweatshirt, and Stanley, a striped shirt. Speaking through his stepdaughter, Lopez identified Stanley and Howard as the men who had robbed him.

## The Charges and the Suppression Hearing

On May 2, 2006, the grand jury indicted defendants for first-degree robbery (two counts) (Penal Law § 160.15), second-degree robbery (Penal Law § 160.10), third-degree robbery (Penal Law § 160.05), fourth-degree grand larceny (Penal Law § 155.30), fourth-degree weapon possession (two counts) (Penal Law § 265.01), unlawful possession of an air-pistol or rifle (Administrative Code of City of NY § 10-131 [b] [1]), fourth-degree criminal possession of marijuana (Penal Law § 221.15) and unlawful possession of marijuana (Penal Law § 221.05). At the ensuing suppression hearing in March 2008, Stanley's attorney argued to Supreme Court that there was no justification for the showup because of the absence of temporal or spatial proximity to the crime, exigent circumstances or an unbroken chain of events. He maintained that the showup was unduly suggestive, the traffic stop had been pretextual and the vehicle search was unjustified. Howard's attorney echoed these arguments.

By decision and order dated April 7, 2008, Supreme Court denied defendants' suppression motion. The judge concluded that the People had met their burden to establish the validity of the stop, based on the observed violation of the open container law (Administrative Code § 10-125), and the legality of the search, in view of the officers' detection of the odor of marijuana. Further, he rejected defense counsels' challenge to the temporal proximity of the showup procedure, citing *People v Wells* (221 AD2d 281 [1st Dept 1995], *lv denied* 87 NY2d 978 [1996] [a two-hour time lapse between the robbery and showup does not compel a conclusion of invalidity]). Supreme Court considered it a matter of no moment that the showup took place five miles from the site of the robbery, or that Lopez was aware he was going to view possible suspects and they may have been hand-cuffed.

## The Trial

The trial commenced in late April 2008. Lopez, Officer Burns and Sergeant Murphy testified for the People as narrated earlier in this opinion. After the close of the People's case, both defense counsel moved for a trial order of dismissal, arguing as follows:

> "[Stanley's attorney]: Judge, I'm going to make a motion for trial order of dismissal on the basis the People have not proved the case as presented in the indictment. I'm also going to reserve to make another [motion] after the close of the defense case.
>
> "[Howard's attorney]: Judge, I would join in [the] application as to the entire indictment, but I'd like to specifically address two of the counts. There's actually three counts [sic]. That is the two counts criminal possession of a weapon, in the fourth degree, and unlawful possession of a pistol or rifle. Judge, as in the case of marijuana, we had experts who came in to testify that marijuana was marijuana. And here we have no experts to come in to [say] they've tested the weapon to determine [its] operability to see if it is an operable weapon to fit under [Penal Law § 265.01 (2)], both counts, and also there have been no experts to come in and actually say that that is an air pistol or rifle as defined in that section. Therefore, I'm moving to dismiss those three counts.
>
> "[Stanley's attorney]: I'll join that application."

The People consented to dismissal of all counts except count one (defendants acted in concert to commit first-degree robbery with what appears to be a pistol), and count three (defendants committed second-degree robbery acting in concert with each other, with another actually present). Howard then called Officer Moreno as a witness, who testified as described earlier in this opinion. There were no other defense witnesses.

In summation, both defense attorneys emphasized what they portrayed as significant problems in the identification of defendants as the robbers. Stanley's attorney emphasized that nowhere in Officer Moreno's handwritten interview notes was one of the robbers described as a heavyset man with dreadlocks, who wore a striped shirt; the radio message described the robbers as four black males, wearing hoodies; and if Lopez had, in fact, given a more detailed description to Officer Moreno when

she interviewed him right after the robbery, she would have recorded it.

He argued that the area where the robbery took place lacked street lights and was dimly lit, and, in any event,

> "when someone is pointing a gun at your face, what you are looking at is that gun, and you are doing whatever the person with the gun is going to tell you to do, and you are not thinking about who is behind you or who came up. That is your focus, and that is why—that is exactly why Mr. Lopez had no descriptions of these people. Because he never got a look at them."

Further, Stanley's attorney contended that a photograph taken of Stanley after his arrest, and admittedly viewed by Lopez, was the real source of Lopez's description of one of the robbers as a heavyset man with dreadlocks, who wore a striped shirt.

Stanley's attorney dismissed the showup. He commented that by 4:00 a.m. Lopez had been up an additional two hours, after a long day at work and the stress of the robbery, and was shown two black males, handcuffed, surrounded by white police officers. He asked, "Who is he going to identify? What choice did he have?" and answered "Zero."

Finally, Stanley's attorney insinuated that the contents of Lopez's wallet might have been planted by the police in the Pontiac. He had painstakingly elicited testimony on cross-examination about the way the police routinely prepare evidence vouchers. He pointed out that the voucher for the contents of Lopez's wallet identified the "finder of property" as merely "NYPD" rather than an individual; characterized as "careful" Officer Burns's testimony that "he did not recover, and . . . did not see anybody recover" the plastic wallet insert; and noted that while Sergeant Murphy claimed to have found this evidence in the Pontiac, his memo book, which would have contemporaneously documented any such discovery, had gone missing.

Howard's attorney questioned whether Lopez could have seen the robbers exiting the car, having conceded he was not paying any attention until he heard footsteps behind him. Like Stanley's attorney, he dwelt on the skimpiness of the descriptions recorded by Officer Moreno, except for the notation that the robbers drove a gray Honda. He intimated that there was something amiss about Sergeant Murphy's inability to document that the

contents of Lopez's wallet were located in the Pontiac. Howard's attorney further suggested that the police officer who called Lopez up to arrange the showup, and who spoke to him in Spanish, in effect coached Lopez that the police had picked up the men who robbed him.

For his part, the prosecutor repeatedly referred to the evidence found in the Pontiac—Lopez's driver's licenses, credit card and other ID, which were tucked in between the driver's seat and the center console, and the "pellet gun" or "black imitation pistol" found in the trunk. He called Lopez a "working guy" who, as a waiter, was accustomed to paying attention to faces. In the prosecutor's telling to the jury, Lopez described the robbery as

> "Stanley's behind him pressing something against his back. The skinny guy was in front [and] told [Lopez] to close [his] eyes, but [he] could see him. [Lopez] had [his] eyes open . . . And he states he saw the larger defendant Hilbert Stanley because he was coming towards [him]. [Lopez] was facing [Stanley] and that's when the thinner one told [him] to turn around. The larger one had braids and the striped shirt."

The prosecutor attributed any "inconsistencies or problems" with Lopez's testimony, as harped upon by defense counsel, not to Lopez's "ability to relate, to recall, to identify," but rather to "somewhat of a language barrier at times with the police officers."

Following deliberations, the jury found defendants guilty of one count of first-degree robbery (Penal Law § 160.15 [4]). Under that provision, "[a] person is guilty of robbery . . . when he forcibly steals property and when, in the course of the commission of the crime . . . he or another participant . . . [d]isplays what appears to be a pistol . . . or other firearm." It is an affirmative defense, however, that the object displayed "was not a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged" (id.). If the defendant proves the affirmative defense by a preponderance of the evidence, the crime is reduced to second-degree robbery (see People v Lopez, 73 NY2d 214, 219 [1989]). First-degree robbery is a B felony, with a determinate sentence range between 5 and 25 years in prison; second-degree robbery is a C felony, with a determinate sentence range between 3½ and 15 years in prison.

Howard absconded during trial and was initially sentenced in absentia to 25 years in prison, the maximum. Upon returning, he was sentenced as a second violent felony offender to a determinate prison term of 14 years plus five years of post-release supervision, to run consecutively with a $1^1/_2$-to-3-year sentence for first-degree bail jumping.[2] Stanley was sentenced to a determinate prison term of 15 years, plus five years of post-release supervision.

## The Appellate Division's Decision

The Appellate Division affirmed, with two Justices dissenting in part (92 AD3d 176 [1st Dept 2012]). On appeal, defendants argued that because the object displayed by Howard during the robbery was a BB gun, not a firearm, the affirmative defense in Penal Law § 160.15 (4) was made out as a matter of law, and their convictions should be reduced to second-degree robbery. They also claimed that Lopez's testimony that Stanley placed an object against his back was insufficient to support a conviction for first-degree robbery.

The court held that these arguments were unpreserved for appellate review because defendants neither asked the trial judge to instruct the jury on the affirmative defense in Penal Law § 160.15 (4) nor objected to its absence from the charge. Additionally, defendants neglected to object that the People's proof did not meet the "display" element of first-degree robbery. And the court declined to reach these arguments in the interest of justice.

As an alternative holding, the Appellate Division concluded that the verdict was supported by legally sufficient evidence, and was not against the weight of the evidence. The court noted that it was enough to establish the "display" element of first-degree robbery that, even though Lopez was not sure the object pushed into his back was a gun, he could have "reasonably . . . perceived Stanley's object to be a gun, particularly since [he] saw Howard holding a gun and at the same time felt Stanley place something against his back" (92 AD3d at 179-180). Thus,

---

2. As a second violent felony offender, Howard was exposed to a determinate sentence range of 10 to 25 years in prison upon his conviction for first-degree robbery. If the jury had convicted him of second-degree robbery, the applicable determinate sentence range would have been 7 to 15 years in prison. As noted previously, Howard was, in fact, sentenced to a prison term of 14 years for first-degree robbery; i.e., his sentence fell within the range for second-degree robbery.

the court distinguished other cases, relied on by the dissenters, where the People's evidence showed that "only one gun was used during the crime and there [was] no indication that another firearm was displayed" (*id.* at 181).

Addressing Howard's argument that his attorney was ineffective for failing to move for dismissal of the first-degree robbery charge, the Appellate Division remarked that "in light of the evidence about Stanley's actions, any such motion would have been unavailing" (*id.*). The court further commented that Stanley's claim that his counsel was ineffective for failing to pursue the affirmative defense was "not reviewable on direct appeal because it involve[d] matters of strategy outside the record," and that, to the extent the existing record permitted review, defendants received effective assistance of counsel (*id.*).

The dissenters would have reduced the convictions of both defendants to second-degree robbery in the interest of justice. In their view, the "undisputed evidence in the case" focused solely on the BB gun (*id.* at 182 [Freedman, J., dissenting]), and it was not enough for Lopez to describe the object in his back as merely "something," and to say that he did not know if it was a gun (*id.* at 184). One of the dissenting Justices granted Howard's motion for leave to appeal, and a Judge of this Court subsequently granted Stanley's related motion (19 NY3d 867 [2012]).

## II.

### Ineffective Assistance of Counsel

Defendants argue that their respective attorneys were ineffective for failing to request dismissal of the first-degree robbery count for insufficient evidence, ask the judge to give a jury charge on the affirmative defense that the "displayed" weapon was incapable of firing a deadly or dangerous shot and request a clarifying instruction as to whether the BB gun or the "something" pushed into Lopez's back was the basis for the first-degree robbery count. To establish lack of meaningful representation on the basis of a few discrete omissions, a defendant must show that his attorney did not raise a "clear-cut" or "dispositive" argument (*see People v Turner*, 5 NY3d 476, 481 [2005] [attorney ineffective for failure to raise a statute-of-limitations defense]). Defendants here are not claiming an overall pattern of ineffective assistance; indeed, they could not, as their attorneys put on a vigorous, if ultimately unsuccessful, misidentification defense.

If the People had put forth no evidence of a gun other than the BB gun, it might be difficult to justify counsel's failure to move to dismiss the first-degree count. But while there was testimony about the BB gun, there was also testimony and argument about the "something" stuck into Lopez's back at the same time the BB gun, which looked genuine, was being pressed against his face and neck. Something hard enough to be felt shoved up against a victim's back is legally sufficient evidence of a displayed firearm for purposes of first-degree robbery (*see People v Baskerville*, 60 NY2d 374, 382 [1983] [towel wrapped around object was displayed firearm]; *Lopez*, 73 NY2d at 218 [finger in pocket could "reasonably be perceived as a firearm"]; *see also People v Groves*, 282 AD2d 278 [1st Dept 2001]). Thus the evidence of "display" of a gun that was not a BB gun was sufficient, and defense counsel were not ineffective for neglecting to challenge the sufficiency of the evidence.

Nor does this record show that counsel were ineffective for failure to put the affirmative defense before the jury. The choice not to do so could have been a reasonable defense strategy. Defendants' attorneys relentlessly pursued a misidentification defense at trial. Stanley's attorney, for example, began his opening statement by telling the jurors that "the wrong person got caught in the [police] net"; he single-mindedly directed his cross-examination at casting doubt on the identification of Stanley as one of the robbers; he began his summation by reminding the jurors that "[w]hen I first spoke to you in opening statements last week, I told you this was a rush to judgment. And that is what the People said in their opening, the net is cast. What I am here to tell you, the net caught the wrong people, caught the wrong person, my client, Hilbert Stanley." Putting on evidence that Stanley had no gun, but rather used his finger, for example, would have undermined the claim that he was simply not there at all.

Given Lopez's eyewitness testimony and, even more importantly, the discovery of the plastic wallet insert in the Pontiac soon after the robbery, a misidentification defense would not seem likely to have resulted in an acquittal, and, of course, it did not succeed. But we cannot say that this is the "rare case [where] it might be possible from the trial record alone to reject all legitimate explanations" for the tack taken by defense counsel (*see People v Rivera*, 71 NY2d 705, 709 [1988]). They did not have much to work with and, for all we know, their clients may have wanted to "go for broke." While it is impossible

to know what sentences the judge might have imposed if Howard and Stanley had been convicted of second- rather than first-degree robbery, in the end, they both received sentences within the range for the lesser crime. And, of course, defendants may raise their ineffective assistance claims in CPL 440.10 motions.

### The Showup Identification

We have endorsed showup identifications following a defendant's arrest at or near the crime scene (*see People v Johnson*, 81 NY2d 828, 831 [1993]). They are also permitted where exigent circumstances exist; for example, the police need to know if they have the right person or should keep looking, or the victim has been mortally wounded and may not be around later to identify an attacker. And we have approved showups as part of an "unbroken chain of events" or ongoing investigation (*see People v Duuvon*, 77 NY2d 541 [1991]). Here, defendants complain that the showup did not fit within any of these parameters and was unduly suggestive.

The showup occurred about five miles from the crime scene, but defendants made their getaway in a car (*cf. Duuvon* [defendant fled on foot]; *Johnson* [same]; *People v Brisco*, 99 NY2d 596 [2003] [same]; *People v Gilford*, 16 NY3d 864 [2011] [same]). The police stopped the Pontiac roughly one hour and 15 minutes after the crime; Lopez identified Howard and Stanley about 45 minutes later, after he was contacted by the police and transported to the location where defendants were stopped and arrested. While defendants suggest that a two-hour interval between the crime and a showup is per se unacceptable, we have never adopted any such bright-line rule. Neither has the Appellate Division (*see e.g. People v McBride*, 242 AD2d 482, 482 [1st Dept 1997] ["Although the investigatory showup was conducted some two hours after the robbery, this time lapse, by itself, does not compel a conclusion that it was improper"]; *Wells, supra*).

Further, the record shows there was no discussion of the suspects with the police during the ride to White Plains Road and 235th Street, where the showup took place (*cf. Johnson*, 81 NY2d at 830 [while transporting the complainant, a postman, back to the lobby of a building where he had been robbed earlier in the day while delivering mail, the police told him "that they knew the name of the person who had robbed him, had a suspect in custody, and were taking (him) back to the crime scene for a positive ID" (internal quotation marks omitted)]). When Lopez

saw defendants, they were obviously suspects and he believed they were handcuffed. But there was no verbal suggestion from any police officer about their identity. Indeed, there was no time for this since Lopez immediately recognized defendants as the two men who had robbed him. Viewing possible suspects is the entire point of a showup, and the lower courts reasonably found that none of the features of this showup rendered it more prejudicial than any other.

Defendants contend there were no exigent circumstances since Howard and Stanley were under arrest for other crimes anyway. But given that the police were looking for armed robbers, they logically would have wanted to move as quickly as possible to find out whether they had apprehended the Claflin Avenue perpetrators, or just garden-variety drug dealers. And we have said that a showup is not improper merely because the police already have probable cause to detain a suspect (*Duuvon*, 77 NY2d at 545).

While showups must be reasonable under the circumstances and not unduly suggestive (*see Brisco*, 99 NY2d at 597), we have repeatedly held that this determination presents a mixed question of law and fact. Mixed questions are beyond our review powers so long as record support exists for the determination made by the lower courts (*see People v Harrison*, 57 NY2d 470, 477 [1982]). This "rule applies where the facts are disputed, where credibility is at issue or *where reasonable minds may differ as to the inference to be drawn*" (*id.* [internal quotation marks omitted and emphasis added]); and "accords with the general principle long recognized in civil cases that *questions of the reasonableness of conduct can rarely be resolved as a matter of law even when the facts are not in dispute*" (*id.* at 478 [emphasis added]).

In sum, showups are by their nature fact-specific; no two are ever going to be exactly alike. And although it is possible to disagree with the lower courts here, it simply cannot be said that no record support exists for their unanimous determination that this showup was reasonable and not unduly suggestive. To the extent we indulge in second-guessing reasonable decisions made by the lower courts when applying the broad principles by which we have advised them to evaluate showups, we only sow confusion.

Finally, we have examined defendants' other arguments and consider them to be without merit.

Accordingly, the orders of the Appellate Division should be affirmed.

Chief Judge LIPPMAN (dissenting). The legally dispositive facts adduced at the pretrial suppression hearing were that, two hours after the alleged robbery and five miles distant from the place of its commission, the codefendants, already under arrest for drug possession, were displayed to the complainant by several police officers, side-by-side, handcuffed, and next to a silver-toned vehicle similar to that in which the perpetrators had, according to the complainant's earlier report, arrived at and left the robbery scene. The complainant, having been advised in advance of the showup that the police "had a person with the characteristics [he] had given," did not fail on his arrival at the showup to identify the detained individuals as the persons who had robbed him.

Even if it were reasonable to suppose that "none of the features of this showup rendered it more prejudicial than any other" (majority op at 403), which it is not (*contrast e.g. People v Wells*, 221 AD2d 281, 281 [1st Dept 1995], *lv denied* 87 NY2d 978 [1996] [where "the police never indicated to the victim that there was a suspect in custody and made it appear to the victim that defendant was not in custody, and the victim, from a distance, was asked only generally to scan the block to see if she saw anyone whom she recognized"]), that would only beg the question. The majority offers no legally satisfactory answer, why identifications obtained in pursuance of such a patently suggestive and gratuitous display should not have been suppressed as risking convictions premised on irreparable misidentification.*

Showup identifications involving an encounter between a suspect or, as here, ostensibly linked suspects and a witness are inherently suggestive and thus strongly disfavored (*People v Riley*, 70 NY2d 523, 529 [1987]; *People v Ortiz*, 90 NY2d 533, 537

---

* Although at trial there was evidence from which the jury could have gathered that the complainant had in fact reliably identified defendants, there was no pretrial finding of independent source to support the admission of the complainant's identification testimony in the first instance, and that omission, we have held, mandates reversal: "The flaw [where identifications have been received at trial following an impermissibly suggestive identification procedure] cannot be retroactively cured because, simply put, the jury heard impermissible in-court identification evidence and the nature of this kind of defect cannot be sanitized after the irretrievable event has occurred. In such circumstances, nothing short of reversal and a new *Wade* hearing and new trial will suffice" (*People v Burts*, 78 NY2d 20, 23 [1991]).

[1997]; *People v Johnson*, 81 NY2d 828, 831 [1993]; *and see Stovall v Denno*, 388 US 293, 302 [1967] ["The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned"]). We have, accordingly, found station house showups presumptively subject to suppression (*see People v Duuvon*, 77 NY2d 541, 544 [1991]). And, although we have been somewhat more lenient respecting the admissibility of showup identifications where there is a legitimate investigatory imperative or exigency to justify their use (*see id.*), we have been clear that this rationale is not so elastic as to permit geographically remote showups hours after the initial confrontation and after the suspect's arrest. Indeed, although we may be said to have "endorsed" a closely defined category of showups in *People v Johnson* (81 NY2d at 831) (*see* majority op at 402), we were careful to qualify that "endorsement" by adding that "the emphasis must be upon *the prompt and immediate nature of an identification* after the crime has been committed, not, as the People argue, after the defendant has been arrested" (81 NY2d at 831 [emphasis supplied]).

Of course, whatever "endorsement" *Johnson* may have contained, it was not of the reviewed Appellate Division decision upholding the denial of Johnson's motion seeking suppression of the complainant's showup identification. In reversing that decision, necessarily upon the ground that it was not consonant with the legal standards governing the admissibility of showup identifications, we noted that "a showup hours after the crime, with both the complainant and the defendant transported to the crime scene, was improper. In those circumstances," we said, "an appropriately conducted lineup was required" (*id.*). Apart from the circumstance that here, the complainant was transported not to, but away from, the crime scene—a circumstance surely not supportive of any conclusion that the showup was within the *Duuvon* dispensation for showups temporally and spatially near the crime—there is nothing to distinguish the present facts from those we found reversible in *Johnson*. In each case the showup followed the crime by hours and involved an arrested subject who could have, and should have, been placed in a lineup. If the mixed question doctrine was not an impediment to review in *Johnson*, neither can it be here. The police conduct was equally offensive to due process in both cases. The mixed question doctrine is abused when employed, as it is here, transparently, to shield from judicial scrutiny police conduct that is simply illegal.

The majority suggests that, even though the instant identification procedure occurred two hours and five miles distant from the crime, it may be accommodated within the *Duuvon* exception for temporally and spatially proximate showups (*see Duuvon*, 77 NY2d at 544) since the perpetrators left the crime scene in a car and because we have never adopted a separation of two hours as a bright line. But this suggestion takes no account of our case law implicitly holding that resort to a showup hours after a crime and subsequent to the defendant's arrest is not compatible with due process (*see Johnson, supra*). Moreover, the notion that significant spatial separation between the crime scene and the showup may be treated as de minimis because perpetrators use a car, particularly when paired with the majority's aversion to temporal limitations, raises the possibility of judicially countenanced showups not merely five miles, but 50 or 100 miles from the place of the crime, long after any legitimate investigatory need for the rapid confirmation or exclusion of an arrestee's status as a criminal suspect by means of a showup must have abated. This is a development plainly not, even remotely, within the contemplation of *Duuvon*, which involved a showup conducted three to four minutes after the crime and around the corner from its place of commission. Even *People v Brisco* (99 NY2d 596 [2003]), until now this Court's furthest temporal extension of the *Duuvon* proximity doctrine, approved a post-crime, pre-showup interval of no more than one hour. Today's decision does not so much extend *Duuvon* as leave it in the dust, turning what was conceived of as a narrow exception limited by the requirements of due process into a rationale for a proliferating, and from this Court's perspective largely unreviewable, reliance upon showups.

Indeed, the Court suggests that a showup is permissible whenever arrestees are suspected of non-"garden-variety" drug offenses significantly implicating public safety. The notion, however, that public safety is well served by routine resort to an inherently suggestive identification procedure, is puzzling. The use of a showup when the conduct of a properly constituted lineup is entirely feasible needlessly and substantially increases the risk of irreparable misidentification and, with it, the hazard that an innocent party will be convicted while the culprit remains at large. Of course, a prompt and immediate showup may be justified when, for example, the only alternative to its conduct is to let go a suspect detained without probable cause or when it is the only means of obtaining an identification from

an ailing or moribund witness. Certainly, there are true exigencies in whose light a lineup would be impracticable and which would render the considerable risks entailed by showups constitutionally tolerable. But, ordinarily, there can be no cognizable exigency premised, as the majority now posits, on the possibility that a party already arrested may *not* have committed an offense other than the one for which he or she has been taken into custody. If there is a question as to whether an arrestee may be identified as the perpetrator of an offense—either the one for which he has been arrested or some other—due process dictates that the inquiry must be satisfied where at all feasible by means of a procedure that is not inherently suggestive. There will, presumably, be few situations in which an arrestee necessarily bound for the station house to be booked, as the present defendants were, could not be placed in a lineup. The People, in any event, made no showing that conducting an appropriate lineup would have been unduly burdensome (*see Riley*, 70 NY2d at 530).

Inasmuch as this highly suggestive showup was not a constitutionally permissible surrogate for a fairly constituted lineup identification procedure, I would reverse the appealed order, grant defendants' omnibus motion to the extent of suppressing the showup identifications, and remand for a new trial, to be preceded by an independent source hearing (*see Burts*, 78 NY2d at 23).

---

Even if a reversal were not required in consequence of the illegal showup, I believe that it would be by reason of trial counsel's inexplicable failure to raise the statutory affirmative defense to first-degree robbery.

While trial counsel vigorously litigated the question of whether the complainant had correctly identified defendants, realistically there was, following the denial of defendants' suppression motion, little chance of an acquittal premised on misidentification. The discovery of the complainant's stolen driver's licence, credit cards and other identification in the vehicle occupied by defendants at the time of their apprehension was not plausibly explicable except by the hypothesis that those items had been placed there by someone involved with the robbery or the robbers; it was extremely powerful confirmation of the accuracy of the complainant's identifications. On the other hand, there did exist an entirely viable defense to the indictment's top

count—one expressly provided for in the first-degree robbery statute under which defendants were charged and which, if successfully interposed, would, as the majority explains (majority op at 398), have significantly reduced defendants' penal exposure.

As is now conceded, the BB gun allegedly brandished by defendant Howard during the robbery is not a "firearm" within the meaning of Penal Law § 160.15 (4), but rather an "imitation pistol" (*see e.g. People v Wilson*, 283 AD2d 339, 340 [1st Dept 2001]). Penal Law § 160.15 (4) specifically provides that "it is an affirmative defense [to first-degree robbery predicated upon the display of a firearm] that such pistol, revolver, rifle, shotgun, machine gun or other firearm *was not a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged*" (emphasis supplied).

Even if there had been a viable alternative factual theory to the BB gun display to support the indictment's first-degree robbery count, it is clear that that theory was far from ironclad. We have held that, to be a sufficient predicate for a first-degree robbery conviction, a firearm display must be reasonably perceived as such by the victim (*People v Baskerville*, 60 NY2d 374, 381 [1983]). Here, the complainant said that he could not tell whether the object held to his back was a gun or something else. While perhaps the inference that the object appeared to the complainant to be a gun remained available to the jury nonetheless, it was hardly compelling. The salient point is that, even if, as the Appellate Division held in the alternative, there was sufficient evidence to support the first-degree robbery conviction based on the back poke attributed to defendant Stanley (92 AD3d 176, 179 [2012]), there remains a reasonable probability that defendants would not have been convicted of first-degree robbery if defense counsel had only interposed the defense that literally stared out at them from the statute under which their clients were charged in the indictment's top count.

Moreover, the Appellate Division's evident assumption that the verdict was in fact alternatively premised on Stanley's "display" of the object poked in Lopez's back (*see id.*)—an assumption now evidently shared by the majority—was completely unwarranted. There is no ground to suppose that the jury's verdict was so founded. So far as the jury knew, or could have known given the trial court's charge, which made no mention of the section 160.15 (4) affirmative defense, the factual theory nearly exclusively stressed at trial—that the BB gun was displayed—remained entirely viable. The overwhelming likelihood

is that, if there was a unanimous verdict at all as to the display element, it was premised on the brandishing of the imitation gun—the factual theory that the affirmative defense would have nixed—and not the object stuck in Lopez's back. But, to the extent that it may not have been, that raises more problems than it solves for the defense of this representational effort mounted by the majority. This is because the viability of an alternative factual theory upon which the jury could have premised their verdict casts into question whether the general verdict was unanimous. In the absence of any assertion of the affirmative defense, there was evidence to support a verdict on both the BB gun display theory and the back poke theory—or so the majority says. It is thus impossible to avoid the conclusion that the general verdict was duplicitous (*see People v Martinez*, 83 NY2d 26, 37 [1993]), and the majority conspicuously makes no effort to do so.

Contrary to the Appellate Division's suggestion, now embraced by the majority, there was no conceivable strategic rationale for counsel's failure to interpose the defense. At the very least, raising the defense would have succeeded in limiting the factual theory upon which the first-degree conviction was put to the jury, and in so doing avoided the possibility, which now cannot be ruled out, that the jury's general verdict was not unanimous as to the factual ground for convicting on the top count. Moreover, moving for dismissal of the top count based on the statutory affirmative defense, as made out by the People's proof, would not in any way have impaired the trial strategy of casting doubt upon the victim's inculpating identifications. And, while the People defend counsel's purported election to present an all or nothing defense, or, as the majority puts it, to "go for broke," going for broke was never an option. It was not as if eliminating the top count or reducing the likelihood of a conviction on that count would have operated to make a not guilty verdict more likely; convicting for second-degree robbery (the second submitted count) was an option the jury would have had in any event. Of course, interposition of the defense would predictably have led to the submission of robbery in the second degree on a display theory, but a conviction of robbery in the second degree would undoubtedly have been a significantly better outcome for defendants than one for robbery in the first degree.

The inclusion of the affirmative defense in Penal Law § 160.15 (4) is all that distinguishes first-degree robbery based upon the display of an apparent firearm from second-degree robbery

based on the display of an apparent firearm (Penal Law § 160.10 [2] [b]). The legislature then has, for all practical purposes, left it, in the end, to defense counsel to assure that a client is not prosecuted excessively for a robbery involving the display of an imitation gun. The reasonable professional expectation reflected in the statute must be that counsel will interpose the defense when there is a basis to do so, thus giving effect to the statutory scheme's contemplated gradation in penal treatment. Counsel's failure to raise the defense was in the present legal and factual context a serious and inexplicable departure from prevailing, and indeed legislatively assumed, standards of professional practice. And, it is at least reasonably probable that had the defense been raised the outcome of the trial would have been significantly less adverse to defendants (see *Strickland v Washington*, 466 US 668, 694 [1984]). Indeed, raising the affirmative defense to first-degree robbery, which, with respect to the BB gun display, was entirely made out by the People's proof, was likely the single most obvious and efficacious act of advocacy counsel could have performed for clients whose prospects of outright acquittal by the time of trial were, dispassionately viewed, exceedingly dim. It is true that what is fundamentally at issue is one error, and the proper focus in evaluating a claim of ineffective representation is upon the total representational effort. Nonetheless, we have recognized that a single clear-cut error may be profoundly prejudicial and thus itself a sufficient ground for an ineffective assistance claim (*People v Turner*, 5 NY3d 476 [2005]). Here, the failure of counsel to interpose the obvious and plainly meritorious affirmative defense more than likely resulted in an insufficiently supported and/or non-unanimous verdict. On this account as well, then, there should be a reversal and a new trial.

ABDUS-SALAAM, J. (dissenting). Like the majority, I conclude that defendants received the effective assistance of counsel. Defense counsels reasonably declined to file a motion to dismiss the first-degree robbery charges, on the ground that the BB gun held by one of the robbers did not satisfy the display element of first-degree robbery, because such a motion would have failed insofar as the object pushed against the victim's back could have been perceived as a firearm, thus rendering the evidence of the display element legally sufficient (see Penal Law § 160.15 [4]; *People v Baskerville*, 60 NY2d 374, 382 [1983]). By forgoing unavailing tactics and attacking the victim's identification of their clients as the robbers, counsels provided defendants with a

competent "go for broke" defense, which, if credited, would have resulted in their acquittal on all the robbery and larceny charges. Therefore, counsels' performance, "viewed in totality and as of the time of the representation," provided defendants with meaningful representation (*see People v Baldi*, 54 NY2d 137, 147 [1981]).

Nonetheless, I dissent from the majority's decision to uphold the showup identification of defendants. As Chief Judge Lippman explains in detail in his well-reasoned dissent (*see* dissenting op at 404-406), the showup was plainly unlawful under our decision in *People v Johnson* (81 NY2d 828 [1993]), wherein we invalidated a showup as a matter of law on a record that is not materially distinguishable from the one presented here (*see id.* at 829-831). Thus, as the Chief Judge rightly observes, "[i]f the mixed question doctrine was not an impediment to review in *Johnson*, neither can it be here," and the showup in this case was "simply illegal" (dissenting op at 405).

The majority insists that the mixed question doctrine insulates the showup from our review because *"reasonable minds may differ as to the inference to be drawn"* from these facts (majority op at 403). However, even accepting the entirety of the hearing court's factual findings, none of the inferences that reasonably may be drawn from those settled facts can support the conclusion that this showup was lawful. Specifically, the hearing court found that, prior to the showup, the arresting officers ceased their immediate canvassing for suspects, returned to their routine patrol and then arrested defendants on drug charges about two hours after the crime and five miles away from the scene. About 15 minutes *after* the arrest, the officers conducted the showup.

From these facts, one simply cannot infer that the police conducted the showup in "one unbroken chain of events—crime, escape, pursuit, apprehension and identifications" (*People v Duuvon*, 77 NY2d 541, 544-545 [1991]), that they were responding to "exigent circumstances requir[ing] immediate identification" (*People v Riley*, 70 NY2d 523, 529 [1987]), or that they otherwise conducted a showup of a "prompt and immediate nature" (*Johnson*, 81 NY2d at 831). Rather, the most charitable inference available is that, within hours of the crime, the officers came upon two men they reasonably believed were involved in the robbery, and after arresting defendants on charges for which they easily could have been held until a court-ordered lineup could be arranged, the officers decided to expedite their

investigation using an inherently suggestive showup identification. Although the showup was certainly convenient and may have been helpful in the broader police investigation, we have never held that such factors can justify a showup absent exigent circumstances or a closer spatial and temporal proximity to the crime.

In addition, the majority's opinion erodes the principles underlying the limited judicial acceptance of showups. In that regard, showups are permitted in rare circumstances based on a finely-tuned balance of competing interests for due process purposes. The substantial infringement on the defendant's liberty interest in avoiding a wrongful prosecution based on misidentification is authorized only where the showup's close proximity to the crime renders it highly reliable or some urgent circumstance necessitates an especially prompt determination of the defendant's involvement in the crime, which serves strong state interests in promptly capturing the guilty and preventing the arrest of the innocent (*see Stovall v Denno*, 388 US 293, 301-302 [1967]; *Duuvon*, 77 NY2d at 545; *see also Simmons v United States*, 390 US 377, 384 [1968]). In other words, we tolerate, rather than routinely approve, showups where uncommonly compelling interests outweigh the individual's presumptive entitlement to be free from suggestive police arranged identification procedures.

In upholding a showup that is not founded on any such compelling need, the majority unmoors the limited allowance of showups from its original constitutional and jurisprudential underpinnings. Thus, the majority risks transforming what previously had been thought a necessary evil into a routinely sanctioned and likely preferred tool of law enforcement. To avoid that outcome, I would reverse the order of the Appellate Division, grant suppression of the showup identification, and remit the matter to Supreme Court for an independent source hearing and new trial.

Judges GRAFFEO, SMITH and PIGOTT concur with Judge READ; Chief Judge LIPPMAN dissents and votes to reverse in an opinion in which Judge RIVERA concurs; Judge ABDUS-SALAAM dissents and votes to reverse in a separate opinion.

In each case: Order affirmed.