People v Wright (2024 NY Slip Op 03320)

People v Wright

2024 NY Slip Op 03320 [42 NY3d 708]

June 18, 2024

Cannataro, J.

Court of Appeals

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, March 19, 2025

[*1]

The People of the State of New York, Respondent,
v
Freddie T. Wright, Appellant.

Argued April 18, 2024; decided June 18, 2024

People v Wright, 203 AD3d 965, affirmed.

{**42 NY3d at 711} OPINION OF THE COURT

Cannataro, J.

Defendant appeals from an order of the Appellate Division upholding the denial of his Batson challenge to the People's exercise of peremptory strikes on two prospective jurors (see Batson v Kentucky, 476 US 79 [1986]), and denying his motion to suppress the identification testimony of two witnesses. Applying our well settled and limited standard of review, there is record support for the determinations below that the People had valid, race-neutral reasons for striking the two prospective jurors. There is likewise record support for the conclusions of the courts below that the showup procedure used by police was not unduly suggestive. We therefore affirm.
I.
On the morning of March 26, 2017, two men robbed a restaurant located on Atlantic Avenue in Queens. Upon entering the restaurant, one of the robbers, a Black man wearing a red "hoodie," black jacket, and a bandana over his face, approached Assistant Manager Sumintra Ramsahoye, took something wrapped in a plastic bag out of his pocket, pressed it to her neck, and told her to open the safe in the restaurant's office. Ramsahoye responded that she could not open the safe and, on the robber's demand, instead opened the drive-through cash register drawers and handed over their contents. While these events were taking place, the other perpetrator was{**42 NY3d at 712} standing next to another employee, Jordan Guzman. After the robbers ran out of the restaurant, Guzman called the police.
Police Officer Bryce Blake and his partner were on duty in a marked patrol car about a block away when they received a radio call of a robbery in progress. The officers arrived at the restaurant within two or three minutes and Officer Blake observed defendant standing in the parking lot dressed in a black jacket and red hoodie. Upon seeing [*2]the patrol car, defendant fled. Officer Blake pursued defendant on foot for several minutes, eventually observing defendant enter a home through its back entrance. The homeowner advised Blake that the individual who entered the house was in the living room. The officers entered the home, found defendant sitting on a couch in the living room, and placed him under arrest.
Simultaneously, other officers were driving Guzman around the neighborhood to see if he could identify the robbers. The canvassing yielded no positive results, but twice, Guzman indicated that individuals stopped by the police were not the perpetrator. Several minutes into the ride, Guzman overheard a radio call indicating that police had apprehended someone and heard one of the officers in the car say, "I think it is the guy." Police then brought Guzman to the house where he identified defendant from his red hoodie and from the way his eyes and forehead looked above the bandana. Police also brought Ramsahoye to the house to make an identification. Upon arriving Ramsahoye saw defendant step out of a police vehicle with his hands behind his back and identified him as the man who robbed her based on his clothing, height, and body weight. At the suppression hearing, which took place over a year later, Guzman was able to identify defendant but Ramshoye was not.
Defendant moved to suppress the identification testimony, arguing that the identification procedures were unduly suggestive. The court denied the motion, finding that the identifications were not "overly suggestive and improper" because they were made in a "very short spatial and temporal time between the incident and arrest." Additionally, the court found that the radio communication and comment overheard by Guzman while riding with police were not so suggestive as to warrant suppression of his identification.
During jury selection, defendant raised a Batson challenge, as relevant here, to the People's use of peremptory strikes on two prospective jurors—C.C. and K.C. C.C., who was a member {**42 NY3d at 713}of the first voir dire panel, was an unmarried Black man with no children who rented his home. When the court inquired of the panel if they knew anyone who had been the victim of a crime, C.C. responded by relating an event 15 years prior in which his cousin was arrested by police for marijuana possession at a family gathering. C.C. recounted that police
"came to the house. They just arrested [my cousin] and took him out and took the other cousins. I had two or three cousins in the house at the time. So they took all three of them and actually, my aunt, which is their mother, with them to the precinct. So they just raided the house and took them all out."
Notably, when asked whether "they were all arrested in that incident," C.C. answered, "Yeah." C.C. gave assurances that he could be fair notwithstanding this incident but, later, when the People inquired whether he harbored any negative feelings about the police as a result of this incident, C.C. responded, "Well, yeah, the way—just the fact that they took everybody. I didn't know that they had to take everybody. But that was it."
Defendant challenged the People's strike of C.C. on the ground that it was an attempt to improperly exclude Black jurors. The court found that defendant had made a prima facie showing that the People sought to exclude C.C. on the basis of race and asked them to provide a nondiscriminatory reason for the use of the strike. The People responded that C.C. "had cousins who had been arrested . . . had other friends that had been involved in multiple arrests . . . that he rents, and he has no children . . . [and] is not married." Defendant countered that "there were jurors that are on this panel that are not African American who meet every one of those criteria that was just annunciated." Supreme Court found that the reasons proffered by the People for their strike of C.C. were not pretextual.
K.C., a Black woman, was another prospective juror who was interviewed during the third round of jury selection. K.C. answered affirmatively when the court asked if any of the jurors worked in law enforcement and explained that she worked for the Department of Probation in Family Court. Specifically, K.C. stated that her job entailed interviewing juveniles who had been charged with a crime to determine if they should receive "intake diversion, which is, like, a short-term probation or if they go to see the judge." The People struck K.C. from the panel with a peremptory strike.{**42 NY3d at 714}
Defendant challenged the use of this peremptory strike on the ground that the People were improperly excluding K.C. based on race. The court found that defendant made a prima facie showing of discrimination and required the People to give a race-neutral explanation for their strike. In response, the People noted that K.C. "works for the Department of Probation in the family court which is obviously within the legal field. And on top of it, she works for probation with juveniles" and that, because of her job, "sympathy might come into play." Defendant countered that K.C. had made clear that "[s]he wouldn't allow sympathy to interfere in her deliberations" and that "[t]here have been other people with law enforcement backgrounds that have not been challenged by the Prosecution." Supreme Court found that the reasons proffered by the prosecution were non-pretextual and denied defendant's Batson challenge.
[*3]
A jury ultimately convicted defendant of second-degree robbery and second-degree criminal trespass. The Appellate Division affirmed, holding that defendant had "failed to satisfy his burden of demonstrating, under the third prong of the Batson test, that the facially race-neutral explanation given by the prosecutor was a pretext for racial discrimination" (203 AD3d 965, 966 [2d Dept 2022]).
A Judge of this Court granted defendant leave to appeal (38 NY3d 1191 [2022]) and we now affirm.
II.
The legislature has long afforded parties to a criminal trial a statutory right to exercise a certain number of peremptory strikes, which are "objection[s] to a prospective juror for which no reason need be assigned" (CPL 270.25 [1]). Unlike a strike for cause, a party exercising a peremptory strike need not give a specific reason why they believe a juror cannot be impartial (see People v Allen, 86 NY2d 101, 108-109 [1995]). Nonetheless, equal justice under the law requires that a criminal trial be devoid of racial discrimination in jury selection, and the Batson process endeavors to ensure that such discrimination does not infect the selection process (see Batson, 476 US at 91).
A Batson challenge requires a three-step analysis to determine whether a peremptory strike was used for the purpose of improper discrimination. At step one, the moving party must make a prima facie showing that the opposing party has exercised a peremptory strike to remove a potential juror on{**42 NY3d at 715} the basis of race (see 476 US at 96). At step two, the burden shifts to the nonmoving party to come forward with a nondiscriminatory reason for each of the challenged strikes (see People v James, 99 NY2d 264, 270 [2002]). Finally, at step three, once race-neutral reasons for the strike are provided, "the inference of discrimination is overcome" and the ultimate burden shifts back to the moving party to "persuad[e] the court that the reasons are merely a pretext for intentional discrimination" (People v Smocum, 99 NY2d 418, 422 [2003]; see People v Hecker, 15 NY3d 625, 634 [2010]).
A trial court's determination at step three of the Batson analysis as to whether use of a peremptory strike is pretextual is accorded "great deference" on appeal (Hecker, 15 NY3d at 656 [internal quotation marks omitted]). "A trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes" (Davis v Ayala, 576 US 257, 273-274 [2015]). Even where reasonable minds might differ as to whether a proffered justification is pretextual, the trial court's finding should be affirmed so long as there exists record support for it (see People v Hernandez, 75 NY2d 350, 356 [1990], affd 500 US 352 [1991]). Only where a trial court's decision as to pretext finds no support in the record may that decision be overturned on the cold record of appeal (see People v Malloy, 33 NY3d 1078, 1079 [2019]; Hecker, 15 NY3d at 657).
The People's asserted reason for striking C.C. was that "he had cousins who had been arrested . . . had other friends that had been involved in multiple arrests . . . that he rents, and he has no children . . . [and] is not married." Initially, we have characterized "family involvement with police officers" as a "clearly nonpretextual" reason for exercising a peremptory challenge (Smocum, 99 NY2d at 420, 423). Moreover, here, the record demonstrates that C.C. felt strongly about the prior incident in which his cousin and family members had been arrested. Indeed, C.C. first mentioned the arrest in response to the court's inquiry as to whether any of the potential jurors knew anyone who had been a victim of a crime, not in response to an inquiry about whether jurors knew anyone who had been arrested. Further, C.C. stated that police "raided the house" and "barged in" prior to arresting his cousin and detaining other family members, suggesting that he harbored strong feelings about the methods used by law enforcement. Finally, C.C. responded in the affirmative when pressed by the People as to{**42 NY3d at 716} whether this incident caused him to have negative feelings towards police.
[1] Any one of these responses would constitute record support for the trial court's pretext determination. Overall, C.C.'s responses gave rise to reasonable inferences that: (1) he viewed the arrest of his cousin for marijuana possession as a crime against his cousin; (2) he viewed the arrest of his cousin as a "raid" by police; and (3) his negative feelings towards police could affect his view of police witnesses in the case, regardless of any contradictory assurances he might have given. These inferences are patently reasonable and the trial court's determination that the nondiscriminatory reasons offered by the People in support of their peremptory strike of C.C. were credible and non-pretextual finds ample support in the record (see Miller-El v Cockrell, 537 US 322, 338-339 [2003]; see also Smocum, 99 NY2d at 420-423).
While it is true that unequal application of even facially neutral reasons for a strike can support a finding of pretext, that is but one factor for a court to consider and does not demonstrate discriminatory intent in and of itself, especially where the circumstances surrounding the challenged juror are distinguishable (see Flowers v Mississippi, 588 US 284, 301-302 [2019]). Here, although there were other prospective jurors whose family members had also [*4]been arrested, the record does not indicate that those jurors shared C.C.'s feelings about the police or felt as strongly as he did about their respective incidents. None of those other jurors made comments indicating that they felt the arrest in question was wrong, or that they had lingering negative feelings about it.
Similarly, although the dissent is correct that disparate questioning " 'can arm a prosecutor with seemingly race-neutral reasons to strike the prospective jurors of a particular race' while 'declin[ing] to seek what they do not want to find about white prospective jurors' " (dissenting op at 
733, quoting Flowers, 588 US at 310), this observation lends more towards a condemnation of the Batson process itself than it does the trial court's decision in this case. After all, Batson requires simply that the People provide a credible non-pretextual reason for striking a particular juror; it does not require a justification for why other jurors were not stricken, and the Supreme Court has never endorsed such an analysis. Moreover, the prosecutor here did question other jurors who related negative experiences with police. For instance K.L. revealed during voir dire{**42 NY3d at 717} that he had a "bad experience[ ]" with the police approximately 10 years earlier when they detained his mother while verifying that she had a vendor's license for her food truck. The prosecutor questioned K.L. about his lingering negative feelings toward police officers because of this encounter and, ultimately, challenged K.L. for cause.[FN1]
Further, the People were not required to credit C.C.'s statement that his feelings regarding his cousin's arrest would not influence his ability to be fair and impartial if his other answers showed an inability to live up to that promise (see Hernandez, 75 NY2d at 356). The dissent's emphasis on C.C.'s self-proclaimed impartiality seems to ignore the purpose of peremptory challenges, which exist for precisely this kind of situation. Indeed, had C.C. answered the other way—that he would not be able to be fair and impartial—the People would have had a legitimate basis to challenge C.C. for cause (see CPL 270.20 [1]).
On this record, "we cannot say as a matter of law that the [People's] proffered reason[s] [were] 'pretext for racial discrimination' " (Malloy, 33 NY3d at 1079, quoting Hernandez v New York, 500 US 352, 363 [1991]). In so concluding, we do not supply our own non-pretextual reasons to justify the People's peremptory strike. We merely review the record before us—as is our obligation—and find ample support for the trial court's undisturbed factual finding that the People's treatment of C.C., to the extent it differed from that of other jurors who had relatives arrested, was not racially motivated (see Hecker, 15 NY3d at 656; People v Vandover, 20 NY3d 235, 239 [2012]).[FN2] Unlike the dissent, we cannot engage in de novo fact-finding.{**42 NY3d at 718}
Finally, the only Batson issue before us on this appeal is whether the record supports the trial court's determination at step three that the People's stated justifications for striking C.C. and K.C. were non-pretextual.[FN3] We note, however, that the trial court did articulate the wrong test at step one of defendant's Batson challenge relating to C.C., stating that the defendant had met his burden of showing that the People were excluding jurors solely on the [*5]basis of race. However, the dissent's attempt to arrogate this misstatement into reversible error—on an issue that was neither objected to below nor raised by defendant on appeal—is misplaced. The parties agree that the trial court properly concluded that defendant satisfied step one of the Batson analysis. There is no evidence that the court's misstatement at step one infected the court's step three analysis. The court applied the correct standard at step three in determining that the People's proffered reason was not pretextual, finding no "basis for discrimination" in the way the People exercised their strikes and that it "believed the reasons given for these jurors given peremptory challenges were not pretextual and were the genuine reasons why [the prosecutor] challenged these jurors." The court's function at step three is distinct from its role at step one and, the dissent's transference theory notwithstanding, the trial court here did not reject defendant's Batson challenge on the ground that defendant had failed to demonstrate that racial discrimination was the sole basis for the strikes. Given the court applied the correct standard at step three, any mischaracterization of the standard at step one is not determinative.
As for prospective juror K.C., the People offered a race-neutral reason for their use of a peremptory strike, specifically that "she works for [P]robation with juveniles." The People expressed concern that K.C.'s job duties would cause her to be inappropriately sympathetic to defendant. K.C.'s job involved determining whether juvenile offenders would be entitled to intake diversion, or face prosecution, and she was previously employed as a caseworker. We have previously recognized that a party may permissibly strike a juror "who works in a certain field . . . because that party believes—for reasons unrelated to {**42 NY3d at 719}the facts of the case—that such individual may have a more sympathetic attitude or view toward the opposing party" (Hecker, 15 NY3d at 664, citing People v Wilson, 43 AD3d 1409, 1411 [4th Dept 2007] [permissible for the People to challenge a social worker on the basis they may be predisposed to sympathy towards defendants], lv denied 9 NY3d 994 [2007]; see also People v Hardy, 61 AD3d 616, 616 [1st Dept 2009] [use of a peremptory strike against a juror who was an aspiring social worker], lv denied 13 NY3d 744 [2009]; People v Wint, 237 AD2d 195, 197 [1st Dept 1997] [use of peremptory strikes against psychiatric worker and social worker], lv denied 89 NY2d 1103 [1997]; People v Mancini, 219 AD2d 456, 457-458 [1st Dept 1995] [use of a peremptory strike against a teacher], lv denied 86 NY2d 844 [1995]). Here, we cannot say that there is no record support for the trial court's finding that the reason offered by the People was not pretextual and as such there is no basis for reversal on these grounds (see Hecker, 15 NY3d at 663-664).[FN4]
III.
[2] Finally, the courts below did not err in holding that the showup identification procedures used immediately after defendant's arrest were not unduly suggestive. Showups are "generally suspect and disfavored" (People v Duuvon, 77 NY2d 541, 543 [1991]). Nonetheless, "at-the-crime-scene civilian showup identifications are not presumptively infirm" (id.) and are permissible "if exigent circumstances require immediate identification, or if the suspects are captured at or near the crime scene and can be viewed by the witness immediately" (People v Riley, 70 NY2d 523, 529 [1987] [citation omitted]; see People v Johnson, 81 NY2d 828, 831 [1993]; People v Gilford, 16 NY3d 864, 868 [2011]).{**42 NY3d at 720}
Although this Court has stated that a showup procedure in which a suspect is handcuffed and in the presence of police is "suggestive and not preferred" and "presses judicial tolerance to its limits" (People v Duuvon, 77 NY2d 541, 545 [1991]), we have concluded that such a showup is "reasonable under the circumstances" when it is conducted in close geographic and temporal proximity to the crime (People v Brisco, 99 NY2d 596, 597 [2003]). When a showup is done as part of "one unbroken chain of events—crime, escape, pursuit, apprehension and identifications"—such a procedure is acceptable (Duuvon, 77 NY2d at 544-545; see also People v Ortiz, 90 NY2d 533, 537 [1997] ["Proof that the showup was conducted in close geographic and temporal proximity to the crime will [*6]generally satisfy . . . the People's burden" of showing that a showup procedure was not unduly suggestive]). As we have recognized, " 'prompt showup identifications by witnesses following a defendant's arrest at or near the crime scene have been generally allowed' " (People v Johnson, 81 NY2d 828, 831 [1993], quoting Duuvon, 77 NY2d at 544; accord People v Howard, 22 NY3d 388, 402 [2013]). Moreover, "[w]hether a crime scene showup is unduly suggestive is a mixed question of law and fact. Thus, if record evidence supports the determination below, this Court's review is at an end" (Brisco, 99 NY2d at 597; see People v Romero, 27 NY3d 981, 982 [2016]; Howard, 22 NY3d at 403; Gilford, 16 NY3d at 868; People v Clark, 85 NY2d 886, 889 [1995]).
Here, as the trial court found, the showups were conducted within a few blocks of the crime scene and took place immediately after the robbery and defendant's apprehension. That defendant was handcuffed and in the presence of police officers is not unusual for a crime-scene showup justified by exigency, particularly where a weapon may have been used in the crime (see e.g. Howard, 22 NY3d at 403; Gilford, 16 NY3d at 867). "[G]iven that the police were looking for armed robbers, they logically would have wanted to move as quickly as possible to find out whether they had apprehended the . . . perpetrator[ ]" and a "showup is not improper merely because the police already have probable cause to detain a suspect" (Howard, 22 NY3d at 403). That the police may have had cause to arrest defendant for trespass, as the dissent contends, does little to mitigate the concern that, if he was not identified by the victims as one of the robbers, the perpetrators of that crime might have remained at large in the community. Moreover, there are indicia of reasonableness in the procedures used; defendant{**42 NY3d at 721} was not shown handcuffed in the back of a police car (compare Duuvon, 77 NY2d at 545); he was not shown to the witnesses with any evidence of the stolen property (compare Riley, 70 NY2d at 530); and the showups were conducted separately—reducing any risk of the witnesses inadvertently influencing each other (compare People v Adams, 53 NY2d 241, 249 [1981]).
To the extent defendant argues that statements overheard by Guzman in the back of the police car were unduly suggestive, certainly, such conduct is not to be encouraged. Nonetheless, it is pertinent that the police had already shown Guzman two other individuals—who they presumably also suspected could have been the robbers and Guzman declined to identify as the perpetrators. In any event, even if "it is possible to disagree with the lower courts here, it simply cannot be said that no record support exists for their unanimous determination that [these] showup[s] [were] reasonable and not unduly suggestive" (Howard, 22 NY3d at 403). "As a result, the determination of the hearing court in this case, undisturbed by the Appellate Division and supported by evidence in the record, is beyond our further review" (Gilford, 16 NY3d at 868).
Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge Wilson (dissenting).
Mr. Wright was convicted, upon a jury trial, of robbing a Taco Bell. He may have done so, but that is not the question before our Court. The question is whether his conviction was obtained consistent with two rules fundamental to the procedural fairness of trials: the police should not use highly suggestive procedures to obtain eyewitness identifications, and prosecutors should not consider the race of prospective jurors when exercising [*7]peremptory strikes. I conclude it was not, and for that reason I would reverse and vacate his conviction so that he can be retried consistent with the requirements of due process.
I.
I turn first to the suggestiveness of the identification procedure. Ms. Ramsahoye, the supervisor on duty, testified that the person who directed her to hand over the registers was "wearing a red hoodie, black jacket." When asked, "Could you see any part of his face," she answered: "No. He had something over his nose." The other witness, Mr. Guzman, testified that {**42 NY3d at 722}he was asleep when the robbers entered the Taco Bell, was awakened by the noise, and before the man took Ms. Ramsahoye into the office he observed only the man's forehead and eyes, because the rest was covered by the hoodie and a bandana. He identified the man as wearing a red hoodie, with no mention of a jacket, black or otherwise. The record is clear: neither witness saw the face of either robber.
Officers Blake and Schuman were in the vicinity of the Taco Bell and responded to a radio call for a robbery in progress, describing the perpetrator as "a male Black, black jacket," with no mention of a red hoodie. When they stopped in front of the Taco Bell, they saw a man wearing a black jacket and red hoodie walking toward a Lincoln Town Car who "took off running" when he saw the officers. They saw him enter the back yard of a house, and although they tried to follow him, they lost sight of him twice, first for "less than ten minute[s]," and then a second time for less than a minute.
Officer Blake then apprehended Mr. Wright in the living room of a house he had no permission to enter, and Officer Blake placed him under arrest. Approximately 5 to 10 minutes later, officers arrived at the scene with Ms. Ramsahoye and Mr. Guzman for the showup identification process. Ms. Ramsahoye testified that officers responding at the Taco Bell "asked [her] to go and identify someone." After arriving at the house, one of the officers told her that they "would bring someone out" of another police car. Although she did not recall exactly how many officers were present, Ms. Ramsahoye testified that there were "quite a few" and that there were at least four police cars.
While sitting in the patrol car, from approximately 30 feet away, Ms. Ramsahoye saw "police br[ing] the suspect" out from another officer's car with his hands behind his back. He was wearing a red hoodie but not a jacket. She did not recognize his face but identified the man as the robber due to "the clothes that he was wearing, the height and his body weight." When asked at the suppression hearing what else Wright was wearing, Ms. Ramsahoye testified, "I don't remember—that's all I remember, just wearing a red hoodie. Of course his jeans or whatnot." At the suppression hearing, Mr. Wright was present, and Ms. Ramsahoye was asked if she recognized him. She said that she was not sure who he was.
At trial, however, Ms. Ramashoye first testified that when the police brought her to see if she could identify the person they were bringing out of a police car, in handcuffs, she{**42 NY3d at 723} recognized that person as the person who had robbed the store, and twice described him, at the time the police brought him out, as wearing a red hoodie and a black jacket when she identified him. Next, she testified that the man she identified when the police brought him out was the defendant. Then, she testified that Mr. Wright was someone with whom she had worked approximately seven years before the robbery, but had not recognized him as her former coworker as the robbery occurred, when she made an identification shortly thereafter, or during the 45 minutes she observed him during the suppression hearing (at which time she could not even identify him as the man who robbed the store).
Turning back to the time just after the robbery, other officers had been driving around the neighborhood with Mr. Guzman in search of the robbers. After "circling the area" for 6 to 10 minutes, Mr. Guzman heard the officers receive "a call and said they stopped a guy and they think it is the guy" and "went to the location" relayed over the radio, the house where Mr. Wright had been apprehended. At the suppression hearing, Mr. Guzman clarified that he overheard the officers receive a call on the police radio, and that one of the officers escorting him stated "I think it is the guy." At trial, Mr. Guzman reaffirmed that while in the police car he heard, over the police radio, someone say that the police had "stopped someone that might be the person," and that one of the officers in the car transporting Mr. Guzman said, "I think we got the guy." When they arrived at the location, Mr. Guzman remembered seeing "a lot of police officers," and he saw "a guy getting arrested outside of a house, escorted outside of a house" handcuffed and in police custody. While seated in a patrol car, from about 20 feet away, Mr. Guzman identified the person under arrest as the robber wearing the red hoodie. However, at trial, Mr. Guzman was not asked whether he saw the robber anywhere in the courtroom, or to make an in-court identification of the defendant.
Mr. Wright moved to suppress both identifications as unduly suggestive. Supreme Court denied his motion, holding that the identifications were not "overly suggestive and improper" because the witnesses were transported one block to identify Mr. Wright 10 to 20 minutes after the robbery, a "very short spatial and temporal time between [*8]the incident and arrest." The Appellate Division affirmed without mentioning the challenge to the identifications by Ms. Ramsahoye and Mr. Guzman as unduly suggestive (203 AD3d 965 [2d Dept 2022]).{**42 NY3d at 724}
Noting that a "confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial," the United States Supreme Court, in the Wade-Stovall-Gilbert trio of cases, established an exclusionary rule barring such identifications when made in the absence of counsel (United States v Wade, 388 US 218, 228 [1967]). Although lineups and photo arrays, even when constructed with the best of intentions, may still create some improper suggestiveness, "[i]t is hard to imagine a situation more clearly conveying the suggestion to the witness that the one presented is believed guilty by police" than "the presentation to the witness of the suspect alone handcuffed to police officers" (id. at 234). "It is firmly established in our jurisprudence that unduly suggestive pretrial identification procedures violate due process and therefore are not admissible to determine the guilt or innocence of an accused" (People v Chipp, 75 NY2d 327, 335 [1990]). The use of impermissibly suggestive identification procedures violates a defendant's right to due process of law (Neil v Biggers, 409 US 188, 196 [1972]). As we have stated, "erroneously induced identification evidence via showups . . . must be vigilantly guarded against because this kind of error drives right into the heart of the adjudicative guilt or innocence process affecting the person accused and identified" (People v Riley, 70 NY2d 523, 531 [1987]).
Nevertheless, we have not held that any suggestiveness attendant to a showup requires the suppression of identification evidence where the police have used a showup. Instead, we have "emphasized . . . that the proof 'must be scrutinized very carefully for [evidence of] unacceptable suggestiveness and unreliability' " (People v Ortiz, 90 NY2d 533, 537 [1997], quoting People v Duuvon, 77 NY2d 541, 543 [1991]), and have set out the following procedure to determine whether identification evidence may be admitted despite the use of a showup:
"While the defendant bears the ultimate burden of proving that a showup procedure is unduly suggestive and subject to suppression, the burden is on the People first to produce evidence validating the admission of such evidence. Initially, the People must demonstrate that the showup was reasonable under the circumstances. Proof that the showup was conducted in close geographic and temporal{**42 NY3d at 725} proximity to the crime will generally satisfy this element of the People's burden. This does not end the inquiry, however. The People also have the burden of producing some evidence relating to the showup itself, in order to demonstrate that the procedure was not unduly suggestive. As we noted in People v Chipp, 'the People have the initial burden of going forward to establish the reasonableness of the police conduct and the lack of any undue suggestiveness in a pretrial identification procedure' " (id. [citations omitted]).
Here, the showups failed both elements of the People's burden, especially with respect to suggestiveness. As to reasonableness under the circumstances, although generally geographic and temporal proximity will establish reasonableness, that is so because in the ordinary case there is an important policy at play that favors a quick determination of whether there is a basis to arrest someone. In this case, however, as Supreme Court itself acknowledged, because Mr. Wright was trespassing in a home whose owner informed the police Mr. Wright had no reason to be there, the police could have (and did) arrest him on that basis, take him to the precinct, and arrange for witnesses to identify Mr. Wright using a far less suggestive procedure, such as a lineup.[FN1]
[*9]
As to the second element of the People's burden, production of evidence demonstrating that the showup was not unduly suggestive, Supreme Court conflated the two different examinations, responding to Mr. Wright's contention that "the showups were unnecessary" because there was "probable cause without {**42 NY3d at 726}the complainants" by pointing out the "very short spatial and temporal time [sic] between the incident and arrest."
"We have held that '[s]howup identifications, by their nature [are] suggestive [and] are strongly disfavored' . . . . By contrast corporeal lineups, properly conducted, generally provide a reliable pretrial identification procedure" (Chipp, 75 NY2d at 335, quoting Riley, 70 NY2d at 529). Here, the showups were particularly suggestive because neither witness saw the robber's face and because the showups could easily have been replaced with a less suggestive pretrial identification procedure.
As a further matter, the evidence at the suppression hearing demonstrated the extreme suggestiveness of the procedures used here. Both witnesses observed Mr. Wright as he was handcuffed, surrounded by "a lot of police officers" and at least four police cars. On his way to identify Mr. Wright, Mr. Guzman heard a transmission over the police radio that the police had apprehended someone they believed was the robber, and an officer in the car transporting Mr. Guzman said "I think we got the guy"—both when Mr. Guzman and the officers were merely three or four blocks away from the scene. Functionally, the suggestiveness in this scenario is no different than a police precinct showup, which we have held inadmissible absent exigent circumstances or proof of an independent source (Riley, 70 NY2d at 529-532).
As to Ms. Ramsahoye, although she did not hear the police statements that Mr. Guzman did, the remaining circumstances were identical. In addition, her sworn testimony at the suppression hearing—that, after observing Mr. Wright there for 45 minutes, she could not say that he was the robber—is strong evidence that the inherent suggestiveness of the showup resulted in her identification of Mr. Wright as the robber, an identification she admittedly did not make based on his facial appearance, but only on his wearing a red hoodie and his general build, which in itself was not distinctive (five feet, six inches, to five feet, eight inches, 170 to 180 pounds).
The combined effect of the suggestive circumstances of this showup procedure pushed "judicial tolerance" beyond "its limits" (Duuvon, 77 NY2d at 545). Absolutely no effort was made by the police to provide for reliable identifications (see Ortiz, 90 NY2d at 537). Particularly because the faces of both of the robbers were covered, we should be loath to sanction use{**42 NY3d at 727} of a highly disfavored identification procedure in a situation where a superior procedure was readily available.
II.
I also conclude that the People impermissibly employed a peremptory strike to exclude potential juror C.C. because of that panelist's race, in violation of Batson v Kentucky (476 US 79 [1986]) and our related case law. When a party raises a Batson challenge, the trial court engages in a familiar three-step process. In step one, the moving party bears the burden of establishing a prima facie case of purposeful discrimination against a cognizable group in the exercise of peremptory strikes (id. at 96; People v Smocum, 99 NY2d 418, 421 [2003]). Once the court finds a prima facie case of unlawful discrimination has been established, the inquiry moves on to step two, in which the nonmoving party must provide a race-neutral reason for excluding each panelist challenged (Batson, 476 US at 94-98; Smocum, 99 NY2d at 422 ["(a)t this second stage the reasons need be only facially permissible"]; People v Allen, 86 NY2d 101, 109 [1995]; see also Hernandez v New York, 500 US 352 [1991]). At step three, the burden shifts back to the moving party to "persuad[e] the court that [the] reasons are merely a pretext for intentional discrimination" (People v Hecker, 15 NY3d 625, 656 [2010]). In step three, the trial court "make[s] an ultimate determination on the issue of discriminatory intent based on all of the facts and circumstances presented," evaluating whether the moving party's proffered reasons are "merely a pretext for intentional discrimination" (Smocum, 99 NY2d at 422).
A.
The trial court's Batson analysis was infected by an erroneous statement of law. The court repeatedly articulated Mr. Wright's burden at step one as establishing "a prima facie case that your adversary has excluded jurors solely on account of their [race]" (emphasis added). That was not a transcription error or errant misspeak: the court repeated its erroneous statement of the law by stating, "I'm asking you what facts and inferences establish a prima [*10]facie case that the Prosecutor has excluded jurors solely on the account of their [race]"; and "your position is that you've established a prima facie case that these jurors were excluded solely because they were African American; is that correct?" That misstates the law. The standard at {**42 NY3d at 728}step one, two or three is the same in this regard: if race (or any other invidious classification) forms any part of a reason for use of a peremptory strike, Batson requires that the strike be rejected (People v Luciano, 10 NY3d 499, 505 [2008] ["The purpose of the Batson rule is to eliminate discrimination, not minimize it" (citation and quotation marks omitted)]; Smith v United States, 966 A2d 367, 369 [DC 2009, as amended on reh May 14, 2009] ["race is an impermissible factor, even if a minor one, in exercising peremptory strikes"], quoting Tursio v United States, 634 A2d 1205, 1212 n 7 [DC 1993]).
However, applying that incorrect standard, the court found that Mr. Wright had made out a prima facie case. That is, at step one, the court found that Mr. Wright had established a prima facie case that certain of the People's peremptory strikes (as to three prospective jurors, C.C., T.C. and A.S.) had been made solely because of the panelists' race. Given that finding, the People's later nonpretextual reasons at most established that the People considered those factors, along with race, as the basis to exclude certain jurors. That, nevertheless, would run afoul of Batson and render the peremptory strikes impermissible.[FN2] Looking at it from another angle, the court's error in concluding that a peremptory strike is unlawful only if race (or another protected classification) is the sole basis for the strike imposed a legally incorrect burden on Mr. Wright at step three, concluding that he failed to prove that the People's reasons were pretextual because he had not demonstrated that racial discrimination was the sole basis for the strikes. That error of law requires automatic reversal and a new trial (Hecker, 15 NY3d at 661).
B.
Even setting aside that error, Mr. Wright met his burden to show that the People's peremptory strike of prospective juror{**42 NY3d at 729} C.C. violated Batson. In the first round of voir dire, 16 potential jurors were questioned, two of whom were African American: C.C. and A.S. During questioning, the court asked:
"Has anyone on the jury or any close friend or associate or family member been the victim of a crime or witnessed a crime or in any way participated somehow in a criminal proceeding? Does anyone know a person who has been the victim of a crime or yourself been the victim of a crime or witness to a crime? Any type of crimes, various crimes. . . . Raise your hand if you've been the victim of a crime. Almost everybody" (emphasis added).
After several potential jurors answered, C.C. answered as follows:
"[C.C.]: Yeah, I had a cousin. This was, like, maybe 15 years ago. He got arrested in his home while I was there because he had some weed on him. And they came to the house. They just arrested him and took him out and took the other cousins. I had two or three cousins in the house at the time. So they took all three of them actually, my aunt, which is their mother, with them to the precinct. So they just raided the house and took them all out. That's the only thing I got.
"THE COURT: That was going to be my next topic or subject matter. Anyway, we'll discuss it. Now would that affect your ability to be fair and impartial in this matter?
[*11]
"[C.C.]: No."
Five additional, non-African American panelists disclosed having family members or close friends who had been arrested; the prosecutor did not challenge or question any of them. Instead, the prosecutor questioned only C.C., at length, about his feelings on his relative's incident:
"[PROSECUTOR]: Okay. How do you feel about how everybody was treated in that situation by the Police Department?
"[C.C.]: Well, I mean, my cousin did the wrong thing and had what he had and bringing it into the house. And that was a bad thing right here. And the fact that they had to come in—one thing I didn't like {**42 NY3d at 730}was when they barged in. I'm not sure if they actually knocked or anything like that, but I know they came in, just grabbed my cousin, found that he had stuff on him, cuffed him and brought everybody out of the house.
"[PROSECUTOR]: So you have a negative feeling about how the police got there and their approach in going inside?
"[C.C.]: Well, yeah, the way—just the fact they took everybody. I didn't know that they had to take everybody. But that was it."
The prosecutor then asked about C.C.'s present feelings and how they might bear on his ability to be impartial here:
"[PROSECUTOR]: . . . There are police officers that are going to take the stand in this case. Do you have any negative feelings from that incident? . . . [D]o you have any negative feelings from that incident with your family that may make it so that when those police officers testify, you may have a prejudgment of them before they even say anything?
"[C.C.]: Not at all.
"[PROSECUTOR]: Okay. So you'll give the police officers a fair shake. . . . [Y]ou'll give them a fair shake, and you'll listen to what they have to say before making any conclusions about them?
"[C.C.] Yes, I will."
Both African American panelists were removed during the first round of voir dire: A.S. was excused for cause; C.C. was peremptorily struck by the prosecution. During the second round, the prosecutor exercised a peremptory challenge against T.C., another African American potential juror, and Mr. Wright's counsel raised a Batson objection as to both T.C. and C.C. After the court found that Mr. Wright had made a prima facie case of discrimination, the Batson inquiry progressed:
"[PROSECUTOR]: . . . I exercised a peremptory challenge based on the fact that [C.C.] had cousins who had been arrested. And I have a note that he had other friends who had been involved in multiple arrests. That was one of the main reasons there.{**42 NY3d at 731} Also, that he rents, and he has no children. He is not married. Those were the reasons at the time for [C.C.].
"[DEFENSE COUNSEL]: Judge, respectfully, there were jurors that are on this panel that are not African American who meet every one of those criteria that was just [e]nunciated. There are people who have been crime victims, people who rent.
[*12]
"THE COURT: [C.C.] did explain that number [sic] of people arrested in the house that he was present concerning marijuana. I recall that. In his background. Okay. . . .
"I don't find any basis for discrimination in the way [the prosecutor] used these challenges. She has good reasons for the reasons she used these challenges, and she stated them on the record. . . . I find I believe the reasons given for these jurors given peremptory challenges were not pretextual and were the genuine reasons why [the prosecutor] challenged these jurors."
i.
The People gave three race-neutral reasons for striking C.C.: (1) C.C. had "cousins who had been arrested"; (2) C.C. "had other friends that had been involved in multiple arrests"; and (3) C.C. was an unmarried renter with no children. The record here demonstrates that those reasons were pretextual.
As to the People's first reason, C.C. recounted an incident 15 years earlier in which his cousin who was arrested for possession of marijuana was taken to the police station along with all of the occupants of the house except C.C.'s grandmother. The prosecutor probed C.C. extensively about the incident, asking pointed questions such as how C.C. felt about "how everybody was treated in that situation by the Police Department" and whether he had "a negative feeling about how the police got there and their approach in going inside." When asked directly about his present feelings, C.C. unequivocally stated twice that his feelings about his cousin's arrest would not influence his ability to be fair and impartial here.
In contrast, at least five non-African American panelists had family members or close friends who had been arrested; none of them was stricken by the People. Some of those arrests were{**42 NY3d at 732} for far more serious crimes, more recent, and of more closely related relatives. The record established that as to those five prospective jurors:
• One's younger brother served approximately four years in prison for third-degree robbery committed "over 15 years ago" and also had an uncle who had been "incarcerated for drugs";
• One had a cousin who served time in prison for tax evasion "between three and five years" ago;
• One had a family member previously incarcerated for gun charges and another family member who was currently serving time for assault;
• One had a cousin who was arrested trying to enter the country without proper legal status "over 10 years ago"; and
• One had a close friend whose husband who was arrested for dealing drugs "about two years ago" as part of a "drug raid" in the Bronx.
Like C.C., each of those panelists answered that their family members' experiences would not affect their ability to be fair in the case here. However, although C.C.'s relationship to someone on the wrong side of the law was far more attenuated in time and/or severity than the other potential jurors who were not African American, the prosecutor subjected only C.C. to extended questioning about his feelings on his relative's relatively minor incident and peremptorily struck only C.C.
In the abstract, "family involvement with police officers" may be a nonpretextual reason for use of a peremptory strike, as the majority asserts (see majority op at 
715, quoting Smocum, 99 NY2d at 423). But in the context here, it is simply not credible to assert that the extended questioning of an African American juror whose cousin was arrested for marijuana possession 15 years ago was not pretextual when the prosecutor cared not a whit about jurors whose relatives and close friends were incarcerated for criminal possession of a weapon, assault, drug dealing and robbery—the crime at issue here. The distinguishing feature as to the disparate prosecutorial interest was that C.C. was African American, and the others with more recent and more severe "family involvement with police officers" [*13]were not. The majority's rationale means that if the People point to some issue that, in the abstract, might be a nondiscriminatory basis to strike a juror, they may wield it in a discriminatory way, singling out African Americans or members of other{**42 NY3d at 733} protected groups for peremptory strikes while ignoring those factors as to others. The majority's rationale is incompatible with the United States Supreme Court's recognition that disparate questioning "can arm a prosecutor with seemingly race-neutral reasons to strike the prospective jurors of a particular race" while "declin[ing] to seek what they do not want to find about white prospective jurors" (Flowers v Mississippi, 588 US 284, 310 [2019]).
The second reason given by the People for striking C.C.—that he had "other friends that had been involved in multiple arrests"—has no support in the record whatsoever. The People now acknowledge that the prosecutor's second reason was "[c]learly . . . in error." It is noteworthy that, among the three reasons given by the prosecutor, the prosecutor singled out this reason as "one of the main reasons" for striking C.C.[FN3] The provision of a reason wholly devoid of support in the record suggests that the reason was pretextual (see People v Coleman, 195 AD3d 1411, 1413 [4th Dept 2021] ["a proffered race-neutral reason cannot withstand a Batson objection where it is based on a statement that the prospective juror did not in fact make"]).
The third reason offered by the prosecutor was that C.C. was an unmarried renter without children. That explanation likewise suggests pretext for two reasons. First, several other non-African American prospective jurors were renters, several were unmarried, and several were childless. Yet the People did not use a peremptory strike on any of those prospective jurors. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination" (Miller-El v Dretke, 545 US 231, 241 [2005]). Second, those characteristics are irrelevant to the facts of this case, which was a commercial robbery that did not involve children, renters or spouses. Although not dispositive standing alone, "[w]hether a proffered reason relates to the {**42 NY3d at 734}facts of a case or a prospective juror's qualifications is certainly a factor relevant to a court's determination of pretext" (Hecker, 15 NY3d at 664; see also Miller-El v Cockrell, 537 US 322, 339 [in the Batson context, "(c)redibility can be measured by, among other factors . . . whether the proffered rationale has some basis in accepted trial strategy"]; Batson, 476 US at 98 ["The prosecutor . . . must articulate a neutral explanation related to the particular case to be tried"]).
Recently, the United States Supreme Court rejected justifications very much like those constituting the People's third reason proffered in this case. In Foster v Chatman, in holding that the prosecutors had violated Batson, the Court rejected proffered reasons because white jurors sharing the characteristics used to justify the peremptory strike of an African American juror were not stricken:
"[O]ther explanations given by the prosecution, while not explicitly contradicted by the record, are difficult to credit because the State willingly accepted white jurors with the same traits that supposedly rendered Garrett an unattractive juror. Lanier told the trial court that he struck Garrett because she was divorced. But he declined to strike three out of the four prospective white jurors who were also divorced. Additionally, Lanier claimed that he struck Garrett because she was too young, and the 'State was looking for older jurors that would not easily identify with the defendant.' Yet Garrett was 34, and the State declined to strike eight white prospective jurors under the age of 36. Two of those white jurors served on the jury; one of those two was only 21 years old" (578 US 488, 505-506 [2016] [citations omitted]).[FN4]
Here, because several non-African American jurors were ultimately empaneled even though they were renters, unmarried and/or childless, the claim that those characteristics were the bases to strike C.C. rests on no "valid line of reasoning" or intentional trial strategy (c.f. Hecker, 15 NY3d at 663-665 [record{**42 NY3d at 735} supported trial court's finding that People's proffered reason was genuine when the People asserted that panelists' education and employment level informed their jury selection strategy and nearly all impaneled jurors met the People's education and employment criteria]). Because "much of the reasoning provided by [the People] has no grounding in fact" (Foster, 578 US at 502), Mr. Wright met his burden to show that the People's stated reasons for striking C.C. were pretextual.
ii.
In Batson cases, our review is "limited to the examination of Supreme Court's pretext determination in light of the reasons placed on the record by . . . counsel concerning her removal of [a prospective juror]. In doing so, we cannot engage in factfinding, but merely search the record for support for the trial court's ultimate pretext determination" (Hecker, 15 NY3d 625, 656-657 [2010] [emphasis added]; see also People v Bridgeforth, 28 NY3d 567, 571 [2016] ["(A)t step three, the trial court must determine, based on the arguments presented by the parties, whether the proffered reason for the peremptory strike was pretextual" (emphasis added)]). It is therefore imperative that the trial court "establish a meaningful record for a reviewing court to uphold its ruling" (Hecker, 15 NY3d at 657; see also People v Payne, 88 NY2d 172, 184 [1996] ["the trial courts bear the judicial responsibility of ensuring that an adequate record is made and of reflecting the basis for their rulings" (emphasis added)]; cf. Snyder v Louisiana, 552 US 472, 479 [2008] [appellate court could not presume the trial judge credited the prosecutor's assertion regarding a struck panelist's demeanor when the record did not show that the trial judge actually made a determination concerning his demeanor]).
Here, the trial court failed to establish an adequate record of its pretext determination with respect to C.C., stating simply that the prosecutor's three proffered reasons were "good reasons for . . . us[ing] these challenges . . . [which] she . . . stated on the record," elaborating only that C.C.'s cousin had been arrested for marijuana—nothing else.[FN5] For the reasons I discussed earlier, those rationales are not supported by the record.{**42 NY3d at 736}
Instead of attempting to defend the reasons given by the prosecutor, as required by Hecker and Bridgeforth, the majority has scoured the record and come up with some reasons the prosecutor could have given, but didn't: "the record demonstrates that C.C. felt strongly about the prior incident in which his cousin and other family members had been arrested" and cites three pieces of evidence "[a]ny one" of which "would constitute record support for the trial court's pretext determination": (1) C.C. first mentioned the arrest in response to the court's inquiry about whether any jurors knew anyone who had been the victim of a crime; (2) C.C. stated that the police " 'raided the house' and 'barged in' [when] arresting his cousin and detaining other family members"; and (3) "C.C. responded in the affirmative when pressed by the People as to whether this incident caused him to have negative feelings towards police" (majority op at 
715-716).
The People did not give those as reasons for striking C.C., and the court likewise did not refer to any of them when concluding that the reasons given by the People were not pretextual. When providing their nonpretextual reasons for striking C.C., the People did not mention C.C.'s feelings toward the police, his use of the words "raid" or "barge," or the fact that he was upset that others in his family had been taken to the police precinct.
Not only has the majority invented reasons never given by the prosecutor or the court, but it has gone far afield of the actual record to do so. For example, contrary to the majority's "reasonable inference" that C.C. "viewed the arrest of his cousin for marijuana possession as a crime against his cousin" (majority op at 
716), C.C. stated [*14]just the opposite: "Well, I mean, my cousin did the wrong thing and had what he had and bringing it into the house. And that was a bad thing right here."
When the majority offers its own nonpretextual reason that C.C. "viewed the arrest of his cousin as a 'raid' by police" (majority op at 
716), the majority is making its own factual determination that "raid" meant something illegitimate, ignoring common parlance[FN6] and this own Court's opinions[FN7]{**42 NY3d at 737} describing legitimate police actions as "raids." The record evidence suggests that the prosecutor did not share the majority's antipathy to the word "raid": a non-Black panelist said that her friend's husband had been arrested in a Bronx "drug raid," yet the prosecutor did not challenge or even ask further questions of that panelist.
Hecker does not permit an appellate court to search the record for facts that would support reasons not given by the People as a basis for striking a juror and conclude that those would have been sufficient had the People asserted them. Reasons not asserted by the People as a basis for a peremptory strike, even if supported in the record, are legally irrelevant under Batson, because a Batson inquiry does not attempt to determine whether a different prosecutor (or the majority of our Court) might have been able to come up with nonpretextual reasons to strike a juror, but whether this prosecutor actually struck the juror solely for nondiscriminatory reasons. That inquiry depends on what the prosecutor said, not on what the prosecutor might have said but didn't.
By allowing an appellate court to arrive at its own nonpretextual reasons found somewhere in the record when the People did not assert those as the reasons they struck a juror who was a member of a protected classification, the majority has undermined the fundamental purpose of Batson. Indeed, even during a Batson hearing, when a prosecutor provided a new reason for a strike after defense counsel pointed out that the originally proffered reasons were factually untrue, the United States Supreme Court observed that "[i]t would be difficult to credit the State's new explanation, which reeks of afterthought" (Miller-El, 545 US at 246).
{**42 NY3d at 738}Batson rests on a subjective determination of a prosecutor's motive: Did race (or some other protected classification) form any part of the reason why the prosecutor struck a juror? If so, a new trial is warranted because as a matter of due process and equal protection, we will not allow such discrimination against prospective jurors or violations of a defendant's constitutional rights to be sanctioned by the court.
III.
A.
The majority's struggle to interject its own state of mind into that of the prosecutor's illustrates why the Batson test itself is fraught with difficulty and should be abandoned in favor of an objective test. Because the Batson test "leave[s] us with a subjective understanding of the concept of discriminatory intent in the peremptories context" (Robin Charlow, Tolerating Deception and Discrimination after Batson, 50 Stan L Rev 9, 37 [1997]), it can provide cover for parties who intend to discriminate by allowing them to obscure their discriminatory intent behind plausible, facially neutral justifications (see e.g. People v Bolling, 79 NY2d 317, 330 [1992, Bellacosa, J., concurring][*15]["Unfortunately, the Batson procedural hurdles have become 'less obstacles to racial discrimination than they are road maps' to disguised discrimination"], quoting Brian J. Serr & Mark Maney, Racism, Peremptory Challenges, and the Democratic Jury: The Jurisprudence of A Delicate Balance, 79 J Crim L & Criminology 1, 59 [1988]). Furthermore, because it focuses solely on the nonmoving party's subjective intent to discriminate, the Batson test is poorly calibrated to detect discrimination deriving from implicit bias, which is likely more common than intentional discrimination deriving from conscious racial animus.[FN8]
{**42 NY3d at 739}Justice Marshall anticipated those concerns in his Batson concurrence:
"[W]hen a defendant can establish a prima facie case, trial courts face the difficult burden of assessing prosecutors' motives. Any prosecutor can easily assert facially neutral reasons for striking a juror, and trial courts are ill equipped to second-guess those reasons. How is the court to treat a prosecutor's statement that he struck a juror because the juror had a son about the same age as defendant . . . ? If such easily generated explanations are sufficient to discharge the prosecutor's obligation to justify his strikes on nonracial grounds, then the protection erected by the Court today may be illusory.
"Nor is outright prevarication by prosecutors the only danger here. '[I]t is even possible that an attorney may lie to himself in an effort to convince himself that his motives are legal.' A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror has acted identically. A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported" (Batson v Kentucky, 476 US 79, 105-106 [1986, Marshall, J., concurring] [citations omitted]).
Six years later, in People v Bolling, Judge Bellacosa noted that "[t]ime and experience with many cases have proven the prescience of Justice Marshall's observations" with respect to the shortcomings of the Batson remedy (79 NY2d at 327 [Bellacosa, J., concurring]), and proclaimed
"[i]t is time for the Legislature to come to terms with the undisputed fact that 'peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate," ' and that the Batson effort has failed to fulfill its stated goal of eradicating invidious discrimination from the jury selection process" (id. at 331 [citations omitted]).
{**42 NY3d at 740}What was evident to some shortly after Batson has been borne out by research over the past four decades: "Even in extreme instances of bias—such as the exclusion of every Black member of the venire . . . it would be relatively easy to generate multiple, race-neutral justifications" (Samuel R. Sommers & Michael I. Norton, Race-Based Judgments, Race-Neutral Justifications: Experimental Examination of Peremptory Use and the Batson Challenge Procedure, 31 Law Hum Behav 261, 269 [2007]; see also Jeffrey Bellin & Junichi P. Semitsu, Widening Batson's Net to Ensnare More than the Unapologetically Bigoted or Painfully Unimaginative Attorney, 96 Cornell L Rev 1075, 1106 [2011] ["Batson, as currently applied, is unable to prevent the use of race in jury selection because its dictates are so easily avoided"]).
[*16]
B.
In the past several years, other states have addressed Batson's inherent shortcomings by adopting an objective standard, which reduces the influence of racial bias in both its conscious and unconscious forms.
In 2018, the State of Washington adopted, in the form of General Rule 37, an objective standard for determining whether a peremptory challenge should be disallowed. Under that rule, "[i]f the court determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied. The court need not find purposeful discrimination to deny the peremptory challenge" (Wash Ct Gen Rules 37 [e]).
Following Washington's lead, in 2020, the California legislature adopted section 231.7 to the California Code of Civil Procedure, which provides that the "court shall consider only the reasons actually given" and shall disallow use of a peremptory strike if "the court determines there is a substantial likelihood that an objectively reasonable person would view race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, as a factor in the use of the peremptory challenge" (Cal Civ Pro Code § 231.7 [d] [1]).[FN9]
{**42 NY3d at 741}Shortly thereafter, the New Jersey Supreme Court observed that "implicit bias is no less real and no less problematic than intentional bias" and that "[t]he effects of both can be the same: a jury selection process that is tainted by discrimination" (State v Andujar, 254 A3d 606, 623 [NJ 2021]). Holding that the use of peremptory challenges driven by implicit bias violated the New Jersey State Constitution, the court modified step three of New Jersey's Batson test to eliminate the requirement that the nonmoving party intended to discriminate, to reduce the use of peremptory challenges driven by implicit bias (id. at 622-623).
Two years ago, the New York State Justice Task Force (the Task Force) recommended amending Criminal Procedure Law § 270.25 by adopting a "reasonable person standard" (see Recommendations Regarding Reforms to Jury Selection in New York at 15, New York State Justice Task Force [Aug. 2022], https://www.nyjusticetaskforce.org/pdfs/Report-on-Recommendations-Regarding-Reforms-to-Jury-Selection-in-New-York.pdf).[FN10] Under that standard, at Batson step three, the trial court evaluates the nonmoving party's proffered reason by asking "[w]hether, in the view of a reasonable person, the race of a juror was a factor in the exercise of the peremptory challenge. If the court determines that the answer is yes, then the peremptory challenge shall be denied" (id.).
Although the Task Force's recommended "reasonable person standard" does not specifically incorporate consideration of implicit bias, because it would replace the current subjective standard with an objective one, it would [*17]represent a significant improvement over our current Batson test because it removes{**42 NY3d at 742} the requirement of the court's evaluation of the nonmoving party's subjective intent to discriminate. Instead, the "reasonable person standard" asks the court to consider whether, from an outside person's perspective, it appears that race played any role at all, increasing the likelihood of empaneling a "jury selected by racially neutral criteria" (People v Childress, 81 NY2d 263, 267 [1993]) Beyond the obvious virtues of relying on a test taken from an objective perspective that will be consistent from court to court and trial to trial, and of rooting out implicit biases, not just intentional ones, the use of an objective standard removes some of the stigma attached to a lawyer's failed attempt to justify a peremptory strike, because the rejection of a strike does not ascribe discriminatory intent to the lawyer:
"No one wishes to accuse those with whom they regularly associate, both professionally and often personally, of moral wrongdoing. Yet virtually every Batson ruling potentially carries such a stigma. . . . Batson violations necessarily involve findings of such socially unacceptable behavior as intentional race or sex discrimination, as well as false representations of the reasons for those unsociable acts. . . . [R]ulings that an attorney has purposefully discriminated by race or sex and then lied about having done so seem freighted with a dimension of personal moral delinquency" (Robin Charlow, Batson "Blame" and its Implications for Equal Protection Analysis, 97 Iowa L Rev 1489, 1493 [2012]).
Our recent decision in People v Boone (30 NY3d 521 [2017]), holding that when a cross-racial eyewitness identification is introduced to prove the identity of a criminal defendant, the defendant is entitled to a jury instruction on the frequent unreliability of such identifications, underscores our court's commitment to eliminating racial bias in the Unified Court System, as does the Unified Court System's operation of its robust Office of Justice Initiatives. The majority's decision undermines that overarching goal.[FN11] Because our Court is now unwilling to apply the Batson test in a meaningful manner, we can only{**42 NY3d at 743} hope that the legislature will implement measures to reduce the effect of bias in the selection of jurors.
Judges Garcia, Singas and Pritzker[FN*] concur. Chief Judge Wilson dissents in an opinion, in which Judges Rivera and Troutman concur. Judge Halligan took no part.
Order affirmed.

Footnotes

Footnote 1:K.L. was stricken on consent of defendant, obviating any need for the People to exercise a peremptory strike as to that juror.

Footnote 2:The facts of Foster v Chatman (578 US 488 [2016]), relied on by the dissent, are strikingly different. In Foster, the prosecutor's voir dire notes and other documentary evidence contained considerable evidence that the People had taken into account the race of the jurors as part of their deliberations as to which jurors to strike, with the Supreme Court observing that the "sheer number of references to race in [the prosecution's] file is arresting" (id. at 513). A "compelling" showing of disparate treatment of Black and non-Black prospective jurors, combined with "shifting explanations, . . . misrepresentations of the record, and the persistent focus on race in the prosecution's file," left the Supreme Court with the "firm conviction that the strikes [in question] were motivated in substantial part by discriminatory intent" (id. at 512-513 [internal quotation marks omitted]). To be sure, such conspicuous evidence of racial motivation is not required for a defendant to sustain the ultimate burden of persuasion on pretext. Nonetheless, the ultimate burden of persuasion on pretext rests on defendant and, here, the People's race-neutral explanations find support in the record.

Footnote 3:It is unclear why the dissent includes other potential jurors in its analysis. A.S., who was struck for cause, and T.C., on whom the People exercised a peremptory strike, are not at issue in this appeal.

Footnote 4:To be sure, there have been many calls for the reform of peremptory strikes (see generally Commonwealth v Fernandes, 487 Mass 770, 776 n 6, 170 NE3d 286, 298 n 6 [2021] ["peremptory challenges themselves are not essential to the constitutional guarantee of a fair trial by an impartial jury, and some have advocated for their outright elimination"]; see also New York State Justice Task Force, Recommendations Regarding Reforms to Jury Selection in New York [Aug. 2022], http://www.nyjusticetaskforce.com/pdfs/Report-on-Recommendations-Regarding-Reforms-to-Jury-Selection-in-New-York.pdf). However, as the law stands, our review is limited to whether there was record support for the trial court's determination. Indeed, defendant neither sought below nor seeks before this Court an alteration to Batson such as that proposed by the dissent.

Footnote 1:The majority observes that the ability to arrest the defendant for trespass "does little to mitigate the concern that, if he was not identified by the victims as one of the robbers, the perpetrators of that crime might have remained at large in the community" (majority op at 
720). But that observation skirts the problem here: an impermissibly suggestive showup increases the probability that the police have apprehended the wrong person—which not only leaves the perpetrator at large in the community, but gives the false sense of security that the perpetrator is in police custody. The majority's other observations do not advance its position: Mr. Wright was not "shown to the witnesses with any evidence of the stolen property" (id. at 721) because (unlike the situation in Riley) Mr. Wright was not found with any evidence of the stolen property, which increases the probability that he was not the robber. Mr. Wright "was not shown handcuffed in the back of a police car" (id. at 720-721), but the witness saw him being removed from the back of a police car with his hands behind his back—hardly a meaningful distinction in terms of suggestiveness.

Footnote 2:This is not, as the majority claims, a "transference" theory between the first and third Batson steps (see majority op at 
718). At step one, the trial court made findings of fact that Mr. Wright had demonstrated prima facie that the prosecutor struck C.C. solely because of C.C.'s race. In view of that factual finding, the evidence tendered by the People at step two, providing some nondiscriminatory reasons for the strike—even if true—is at most legally sufficient to show that the prosecutor had mixed motives, some permissible, some not. As our case law and United States Supreme Court case law firmly establishes, and the majority concedes, a mix of discriminatory and nondiscriminatory motives still establishes a Batson violation (see Luciano, 10 NY3d at 505; Smith, 966 A2d at 369).

Footnote 3:The People now speculate that "[p]erhaps [the prosecutor] meant to refer to the additional cousins who were arrested instead of 'friends.' " However, "our review power is limited to the examination of [the] Supreme Court's pretext determination in light of the reasons placed on the record by" the prosecutor (Hecker, 15 NY3d at 657), and the reason given here was that C.C. had friends involved in multiple arrests. The prosecutor's mischaracterization that friends of C.C.'s were involved in multiple arrests is strong evidence that the prosecutor was engaged in fabricating pretextual reasons to strike C.C.

Footnote 4:In an attempt to distinguish Foster, the majority points to other portions of Foster that reference the record in that case. However, as the portion quoted above makes clear, this part of Foster's analysis relates to the prosecutor's race-based differential use of strikes for otherwise similarly situated jurors, not anything having to do with the "prosecutor's voir dire notes and other documentary evidence" (majority op at 
717-718 n 2).

Footnote 5:"THE COURT: [C.C.] did explain that number of people arrested in the house that he was present concerning marijuana. I recall that. In his background. Okay."

Footnote 6:Media and law enforcement agencies use the term "raid" to describe legitimate law enforcement actions (see e.g. Retired Vice Detective and Seven Active Duty NYPD Police Officers Indicted for Involvement with Prostitution Ring in Queens, Brooklyn, and Nassau Counties, NYPD Press Release, Sept. 13, 2018, https://www.nyc.gov/site/nypd/news/pr0913/retired-vice-detective-seven-active-duty-nypd-police-officers-indicted-involvement-with#/0 [retired detective indicted when he "allegedly used his contacts within the NYPD to thwart raids by paying for confidential police information" (emphasis added)]; Fentanyl Dealer Sentenced to 20 Years in Prison, DEA Press Release, Mar. 18, 2024, https://www.dea.gov/press-releases/2024/03/18/fentanyl-dealer-sentenced-20-years-prison ["Mr. Ray admitted that during a 2019 raid on his apartment, law enforcement seized more than 28,000 counterfeit fentanyl pills weighing more than 12.5 kilograms. During subsequent raids on the homes of two coconspirators, law enforcement seized an additional 114,000 counterfeit fentanyl pills" (emphasis added)]).

Footnote 7:See e.g. Ferreira v City of Binghamton, 38 NY3d 298, 317 (2022) (describing lawful no-knock search warrants as "raids [that] are often conducted in the early-morning hours to catch people off-guard"); People v Mirenda, 57 NY2d 261, 264-265 (1982) (upholding conviction where "the police, armed with a search warrant" conducted a "raid on a Yonkers garage").

Footnote 8:See e.g. Caren Myers Morrison, Negotiating Peremptory Challenges, 104 J Crim L & Criminology 1, 4-5 (2014) ("[T]he Batson framework relies on apparently commonsense assumptions about human behavior [that] are contrary to what we know about human mental processes and the influence of race on decisionmaking. . . . [Batson is] inconsistent with recent advances in cognitive social psychology. While long suspected, there is now substantial empirical evidence that most of us labor under some amount of implicit bias against racial minorities, even when we believe ourselves to be unbiased. . . . It is time to subject Batson to behavioral realism—the demand 'that the law account for the most accurate model of human thought, decisionmaking, and action provided by the sciences' "), quoting Jerry Kang & Kristin Lane, Seeing through Colorblindness: Implicit Bias and the Law, 58 UCLA L Rev 465, 468 (2010).

Footnote 9:Acknowledging the ubiquity and intractability of implicit bias, those states explicitly ascribe the to the objective observer cognizance of that phenomenon. Washington, for example, defines an "objective observer" as one who "is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors" (Wash Ct Gen Rules rule 37 [f]; see also Cal Civ Pro Code § 231.7 [d] [2] [A] ["(A)n objectively reasonable person is aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in the State of California"]; Conn Rules Super Ct § 5-12 [e] [1] ["an objective observer . . . is aware that purposeful discrimination, and implicit, institutional, and unconscious biases, have historically resulted in the unfair exclusion of potential jurors on the basis of their race, or ethnicity"]).

Footnote 10:The Justice Task Force is composed of distinguished "prosecutors, defense attorneys, judges, law enforcement personnel, legal scholars, legislative representatives, executive branch officials, forensic experts and victim advocates" (New York State Justice Task Force, Mission Statement, About The Task Force, http://www.nyjusticetaskforce.com/mission.html [accessed June 10, 2024]). Its mission is "to promote fairness, effectiveness, and efficiency in the criminal justice system; to eradicate harms caused by wrongful convictions; to further public safety; and to recommend judicial and legislative reforms to advance these causes throughout the State of New York" (id.).

Footnote 11:Likewise, the majority's statements that "our review is limited to whether there was record support" (majority op at 
719 n 4) and "the only Batson issue before us on this appeal is whether the record supports the trial court's determination at step three" (id. at 
718) are incompatible with our powers and responsibilities. Batson itself is a court-made rule, as are the improvements to Batson adopted by the Supreme Courts of Washington and New Jersey; and our Court has regularly announced new rules to promote the fairness of the trial process (most recently in Boone).

Footnote *:Designated pursuant to NY Constitution, article VI, § 2.